HÉCTOR BERBERENA y OTROS, demandantes y apelados, *v.* ILEANA ECHEGOYEN, ADMINISTRADORA DE DERECHO AL TRABAJO, ETC., demandados y apelantes; ASOCIACIÓN DE MAESTROS DE PUERTO RICO y FEDERACIÓN DE MAESTROS DE PUERTO RICO, interventoras y recurrentes.

*Números:* AC-88-694 *Resueltos:* 28 de junio de 1991
RE-88-498
RE-88-517

*Rafael Ortiz Carrión, Procurador General,* y *Sylvia Cancio Bigas, Procuradora General Auxiliar,* abogados de los apelantes; *Miguel A. Giménez Muñoz,* abogado de los apelados; *Rafael A. Nadal Arcelay,* abogado de la Asociación de Maestros de Puerto Rico, y *Raúl Santiago Meléndez,* abogado de la Federación de Maestros de Puerto Rico, interventoras y recurrentes.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

En un caso revestido de gran interés público, revisamos el déereto de inconstitucionalidad de la Sec. 6 de la Ley Núm. 25 de 3 de junio de 1960 (18 L.P.R.A. ant. sec. 249d), que disponía que todo maestro en servicio activo del Departamento de Instrucción Pública, que fuese candidato oficial a un cargo electivo, sería automáticamente relevado de sus funciones docentes y tendría derecho a una licencia especial con sueldo hasta un día después de la celebración de las elecciones.

Evaluadas las comparecencias de las partes y de los interventores, Asociación de Maestros de Puerto Rico (Asociación) y Federación de Maestros de Puerto Rico (Federación), resolvemos que la Sec. 6 de la Ley Núm. 25, *supra,* no violaba la cláusula de la igual protección de las leyes de la Constitución del Estado Libre Asociado de Puerto. Rico. Revocamos el dictamen del Tribunal Superior, Sala de San Juan.

# I

Los hechos de este caso son relativamente sencillos. Cuatro (4) empleados públicos de carrera, certificados por el Partido Nuevo Progresista (P.N.P.) como candidatos a distintos cargos políticos en los comicios de 1988,(1) solicitaron a sus respectivas agencias que se les concediesen los beneficios de una licencia política con sueldo. Cada uno de los jefes de agencia denegó la solicitud amparándose en que no tenían facultad en ley para otorgar la licencia requerida. Inconformes con esa decisión, los empleados presentaron en el Tribunal Superior, Sala de San Juan, una petición de *mandamus*, de *injunction* preliminar y permanente, y de sentencia declaratoria, en la cual argumentaron ser víctimas de un trato discriminatorio, ya que la Sec. 6 de la Ley Núm. 25, *supra*, autorizaba la concesión de licencias políticas con sueldo solamente a los maestros del Departamento de Instrucción Pública. Solicitaron como remedio que se ordenara a los jefes de agencia demandados concederles los beneficios solicitados.

Después de unos trámites procesales, el Tribunal Superior emitió una orden en la cual denegó remedios provisionales e indicó que el litigio gozaba más de la característica de una sentencia declaratoria que de una acción interdictal. Como consecuencia, ordenó la comparecencia de la Secretaria de Instrucción Pública, de la Federación y de la Asociación para que expresaran su posición sobre la constitucionalidad de la Sec. 6 de la Ley Núm. 25, *supra*. Concluidos esos trámites, el tribunal declaró inconstitucional el estatuto porque violaba la cláusula que garantiza la igual protección de las leyes. También, expidió un *injunction* permanente contra la Secretaria de Instrucción Pública y el Secretario

---

(1) a) *Héctor Berberena-* se desempeñaba como Coordinador Regional en la Administración del Derecho al Trabajo (A.D.T.). Aspiraba al cargo de Alcalde del Municipio de Humacao.

b) *José A. Meléndez-* era empleado regular del Departamento de Transportación y Obras Públicas (D.T.O.P.). Aspiraba al cargo de Alcalde del Municipio de Naguabo.

c) *José R. Díaz Coss-* era empleado regular del D.T.O.P. Aspiraba al cargo de Senador por el Distrito de Humacao.

d) *Aníbal Meléndez Rivera-* era empleado regular del Departamento de Servicios Sociales. Aspiraba al cargo de Alcalde del Municipio de Fajardo.

de Hacienda, ordenándoles que se abstuvieran de conceder licencias políticas con sueldo a los maestros y que cancelaran todas aquellas que fueron autorizadas a partir del 1ro de enero de 1989.

De esa sentencia apela el Procurador General de Puerto Rico y los interventores, Asociación y Federación, argumentando que erró el foro de instancia al declarar inconstitucional la Sec. 6 de la Ley Núm. 25, *supra.* Nos invitan a que revoquemos ese dictamen y evaluemos dicha legislación a la luz de un escrutinio judicial tradicional mínimo. Aceptamos la apelación presentada por el Estado y ordenamos la consolidación de los recursos de revisión y la expedición de los respectivos mandamientos al tribunal de instancia. En auxilio de nuestra jurisdicción, paralizamos los procedimientos hasta tanto pasáramos juicio sobre los méritos de los recursos. *Berberena v. Echegoyen,* 123 D.P.R. 76 (1988). Completado el trámite de rigor, estamos en posición de resolver. Revocamos.

## II

 Antes de considerar los méritos de este recurso, y a raíz de una serie de eventos que han ocurrido desde que el foro de instancia dictó sentencia el 13 de octubre de 1988, debemos examinar si el recurso elevado ante este Foro se ha tornado académico.(2) Veamos.

 Las elecciones generales de Puerto Rico, para las cuales los demandantes apelados solicitaron su licencia con paga, fueron

_____

(2) El efecto procesal de una determinación de academicidad en apelación, tras la declaración de inconstitucionalidad de una ley, es que el decreto del tribunal de instancia queda anulado (*vacated*) y el caso se devuelve con órdenes de desestimar la demanda. Véanse, a modo ilustrativo: *Burke v. Barnes,* 479 U.S. 361 (1987); *United States v. Munsingwear,* 340 U.S. 36, 39 (1950); *Great Western Sugar Co. v. Nelson,* 442 U.S. 92 (1979); *Duke Power Co. v. Greenwood Co.,* 299 U.S. 259, 267 (1936). Por su efecto perjudicial, la doctrina de academicidad debe ser aplicada con cuidado.

Por otro lado, aunque se anule el decreto del tribunal de instancia, no se ordenará la desestimación si hay otras controversias que deben dirimirse en dicho foro. Véase, a modo ilustrativo, *Department of Treasury v. Galioto,* 477 U.S. 556 (1986). Podría también anularse el decreto, pero devolver el caso para que las partes enmienden sus alegaciones a la luz de los nuevos hechos y que la causa se dilucide a base de las controversias entonces presentadas. Véase *Duke Power Co. v. Greenwood Co.,* supra.

celebradas en noviembre de 1988. Tomamos conocimiento judicial de que en esas elecciones todos los demandantes apelados fueron candidatos, de que el Sr. José A. Meléndez y el Sr. Aníbal Meléndez Rivera fueron elegidos Alcaldes de los Municipios de Naguabo y de Fajardo, respectivamente, y de que se encuentran desempeñando dichos cargos. Sin embargo, esto no es óbice para que adjudiquemos el recurso en sus méritos.

█ En el caso de autos existen las circunstancias que aconsejan que invoquemos las excepciones a la doctrina de academicidad. *Noriega v. Gobernador,* 122 D.P.R. 650 (1988); *El Vocero v. Junta de Planificación,* 121 D.P.R. 115 (1988); *Com. de la Mujer v. Srio. de Justicia,* 109 D.P.R. 715 (1980); *E.L.A. v. Aguayo,* 80 D.P.R. 552 (1958). En primer lugar, la controversia es recurrente respecto a los demandantes apelados, pues pueden aspirar a una nueva candidatura en elecciones futuras. Además, es susceptible de repetirse respecto a otros empleados públicos que deseen aspirar a puestos electivos y soliciten licencias con sueldo. *Asoc. de Periodistas v. González,* 127 D.P.R. 704 (1991); *Com. de la Mujer v. Srio. de Justicia,* supra, pág. 725.

Consideramos también que por el poco tiempo que transcurre entre la certificación de una candidatura y el día de las elecciones, y la alta probabilidad de que el asunto no pueda resolverse finalmente antes de que se celebren los comicios, esta controversia es capaz de evadir la revisión judicial. Un ejemplo de lo anterior es el caso de autos. En estas circunstancias, el caso plantea una cuestión recurrente que por su naturaleza hace muy difícil dilucidarla en los tribunales. *Asoc. de Periodistas v. González,* supra; *Hosp. San Pablo v. Hosp. Hnos. Meléndez,* 123 D.P.R. 720 (1989).

## III

Por otro lado, la aprobación de la Ley Núm. 68 de 28 de agosto de 1990 (3 L.P.R.A. sec. 391 *et seq.*) mientras esta Curia tenía sometida la apelación del Estado tampoco hace académica esta controversia.

■ Recordemos que, de ordinario, un caso se torna académico cuando la Asamblea Legislativa enmienda el estatuto impugnado constitucionalmente antes de que el foro apelativo revise el decreto de inconstitucionalidad de un tribunal de instancia. La academicidad sobreviene si la nueva ley pone fin a la controversia planteada en el recurso y corrige el defecto o elimina la disposición en controversia. Es por esto que al adjudicar la controversia se toma en consideración que la ley se aplicará no como estaba antes, sino como está luego de enmendada. Véanse: *Kremens v. Bartley*, 431 U.S. 119, 126–129 (1977); *Fusari v. Steinberg*, 419 U.S. 379, 380, rev. denegada, 420 U.S. 955 (1975); *Department of Treasury v. Galioto*, 477 U.S. 556 (1986).[3] Bajo estas circunstancias, no habría un caso o una controversia que amerite consideración por el foro apelativo, pues la misma fue resuelta al aprobarse la nueva ley, y las circunstancias que originaron el recurso presentado ya no estaban presentes. Véase *Nogueras v. Hernández Colón*, 127 D.P.R. 638 (1991). Lo mismo ocurriría si la ley declarada inconstitucional en el foro de instancia es derogada totalmente. Véase *Bryan v. Austin*, 354 U.S. 933 (1957).

■ Sin embargo, si a pesar de las enmiendas la nueva ley *no resuelve la controversia o el asunto sometido*, el tribunal apelativo retiene jurisdicción sobre el caso. Véanse: *National Coal Operators' Assn. v. Kleppe*, 423 U.S. 388, 393 esc. 4 (1976); *Brockington v. Rhodes*, 396 U.S. 41, 43 (1969); *Panama Refining Co. v. Ryan*, 293 U.S. 388, 413–414 (1935); *Campbell v. California*, 200 U.S. 87, 91–93 (1906); Anotación, *What Circumstances Render Civil Case, or Issues Arising Therein, Moot so as to Preclude Supreme Court's Consideration of their Merits*, 44 L.Ed.2d 745, 758–760 (1976). En ese caso, la controversia sigue viva y requiere la adjudicación del foro apelativo. Entonces, la determinación del foro de instancia debe revisarse a la luz de la ley tal y como se encuentra actualmente, no como estaba al momento de la adjudi-

---

[3] Las referencias a la jurisprudencia del Tribunal Supremo de Estados Unidos en todas las partes de esta ponencia son con propósitos ilustrativos o a los fines de identificar el contenido mínimo de las cláusulas constitucionales en controversia.

cación en primera instancia. Véanse: *Diffenderfer v. Central Baptist Church*, 404 U.S. 412, 414 (1972); *Hall v. Beals*, 396 U.S. 45, 48 (1969).

En el caso de autos, mientras el recurso se encontraba en este foro apelativo, la Asamblea Legislativa aprobó la Ley Núm. 68, *supra*, que cambió el nombre del Departamento de Instrucción Pública y adoptó un nuevo ordenamiento para la educación en todo el país. Por virtud de la Ley Núm. 4 de 31 de octubre de 1990 (3 L.P.R.A. sec. 391 n.) se aclaró que la Ley Núm. 68, *supra*, entraría en vigor el mismo día de su aprobación. Procede, a tenor con las normas sobre academicidad anteriormente expuestas, que examinemos la nueva ley y los planteamientos presentados para determinar si las controversias de autos aún subsisten bajo la nueva ley y si una determinación nuestra no resulta académica. Es decir, debemos determinar si los demandantes apelados quedan en la misma posición en que se encontraban bajo la Ley Núm. 25, *supra*, y si bajo la nueva ley se presentan las mismas cuestiones constitucionales.

## IV

Al amparo del ordenamiento provisto por la Ley Núm. 25, *supra*, la Sec. 6, que regulaba la concesión de licencias políticas para los maestros del Departamento de Instrucción Pública, disponía:

Cuando un maestro de instrucción pública en servicio activo sea oficialmente nominado para un cargo de elección popular por un partido político y decida aceptar su candidatura, quedará automáticamente relevado del servicio diurno y nocturno *a partir de la fecha en que su candidatura quede definitivamente radicada en la Secretaría de Estado hasta pasadas las elecciones generales en Puerto Rico; Disponiéndose, que en tal caso el Secretario de Instrucción Pública concederá una licencia especial con paga al maestro concernido, desde la fecha de la radicación definitiva de su candidatura en el año de elecciones hasta un día después de celebradas las mismas.* Esta licencia no será descontada de ningún otro tipo de licencia. *En adición a dicha licencia con sueldo tendrá*

*derecho a solicitar y disfrutar de licencia sin sueldo hasta la terminación del primer semestre escolar. De no salir electo podrá reintegrarse, si así lo deseare, a su antiguo cargo con los mismos derechos y prerrogativas que tuviere al momento de su separación.* Si su plaza estuviere ocupada o si no hubiere una plaza vacante de la misma categor[í]a en su distrito escolar el Secretario de Instrucción Pública prorrogará la licencia especial con paga hasta la iniciación oficial del segundo semestre escolar. *De salir electo, el Secretario de Instrucción Pública deberá concederle licencia sin sueldo por el período de su incumbencia en el cargo, si el maestro lo solicitare.* (Énfasis suplido.) 18 L.P.R.A. ant. sec. 249d.

Esta sección contiene un esquema para la concesión de licencias políticas a los maestros que estén desempeñándose activamente en el Departamento de Instrucción Pública y que hayan aceptado la candidatura oficial para un cargo público. En tal caso, se le confiere facultad al Secretario de Instrucción Pública para concederle al maestro una licencia especial con paga *desde la fecha de la presentación de su candidatura durante el año eleccionario hasta un día después de las elecciones.* Si no sale electo y al reintegrarse durante el primer semestre escolar a su antiguo cargo no puede ocupar la plaza por no haber vacantes en su distrito, tendrá derecho a que se le extienda la licencia con paga hasta que termine el primer semestre escolar. Por otro lado, si no sale electo y no desea reintegrarse a sus labores inmediatamente, tiene derecho a una licencia especial sin sueldo hasta que termine el primer semestre escolar. De salir electo, el maestro tendrá derecho, si lo solicita, a la licencia especial sin sueldo durante el período de incumbencia en el cargo.

Como vemos, el estatuto le confiere solamente a los maestros activos del Departamento de Instrucción Pública el derecho a disfrutar de una licencia con sueldo para defender sus candidaturas. La clasificación que crea el estatuto divide a los maestros activos de los demás empleados públicos que no están cobijados por la legislación.

Por otro lado, la nueva ley dispone, en lo pertinente, como sigue:

Cuando un maestro del salón de clases que esté ejerciendo como tal en el sistema de educación pública *sea oficialmente nominado para el cargo de gobernador, comisionado residente, senador, representante o alcalde, y decida aceptar su candidatura, quedará automáticamente relevado del servicio a partir del primero (1ro.) de agosto del año electoral hasta el lunes inmediatamente siguiente al día en que se celebren las elecciones generales en Puerto Rico.* En tal caso[,] se concederá al maestro una *licencia especial con paga durante el período antes indicado.* Esta licencia no será descontada de ningún otro tipo de licencia. Además, el maestro *tendrá derecho a solicitar y disfrutar de licencia sin sueldo hasta la terminación del primer semestre escolar.* De no salir electo, podrá reintegrarse a su antiguo cargo, si así lo desea, con los mismos derechos y prerrogativas que tenía al momento de su separación. *Si su plaza estuviere ocupada o si no hubiese una plaza vacante de la misma categoría en su distrito escolar, el Secretario de Educación prorrogará la licencia especial con paga hasta el inicio oficial del segundo semestre escolar.* De salir electo, el Secretario deberá concederle licencia sin sueldo por el período de su incumbencia en el cargo, si el maestro la solicita. (Énfasis suplido.) 3 L.P.R.A. sec. 393m.

█ Al comparar estas leyes notamos que el esquema de licencias con sueldo a maestros que sean candidatos a ciertos puestos electivos, que fuera declarado inconstitucional por el tribunal de instancia, fue ratificado recientemente por la Asamblea Legislativa y continúa siendo un beneficio concedido únicamente a la clase magisterial. No obstante el dictamen del tribunal a quo, la Comisión Especial Conjunta para la Reforma Educativa Integral, en su informe a los cuerpos legislativos, reafirmó su propósito de conservar el mismo sistema de licencias con sueldo a los maestros de los salones de clase:

Se reitera el derecho a la libre expresión del magisterio y el reconocido interés que se plasma en la Ley Núm. 25 de 3 de junio de 1960, según enmendada, de que el magisterio participe en los procesos políticos de nuestro país. No obstante, y en beneficio del ambiente escolar que debe imperar para la consecución de la excelencia educativa[,] y para el proceso de enseñanza[-]aprendizaje, *se mantienen las limitaciones y condiciones que fija la Ley Núm. 25.* (Énfasis suplido.) Informe de la Comisión Especial

Conjunta para la Reforma Educativa Integral de 5 de julio de 1990, págs. 17–18.

La nueva ley también concede licencias con sueldo a aquellos maestros oficialmente nominados para los cargos de Gobernador, Comisionado Residente, Senador, Representante o Alcalde. Difiere de la Ley Núm. 25, *supra*, en cuanto a que limita la concesión de la licencia a maestros del salón de clases que ejercen como tales en el Sistema de Educación Pública y especifica cuáles son los cargos electivos a los que los maestros tienen que ser nominados para tener derecho a la licencia con sueldo.[4] Además, restringe la licencia con paga al período comprendido desde el 1ro de agosto del año electoral hasta el lunes inmediatamente después de las elecciones, y no desde la fecha de presentación de la candidatura como disponía la ley anterior.

Comparados ambos estatutos, concluimos que los cambios sufridos por la nueva ley no convierten en académicos los planteamientos de los demandantes apelados. Éstos alegaban que la Sec. 6 de la Ley Núm. 25, *supra*, violaba la igual protección de las leyes porque autorizaba la concesión de licencias políticas con sueldo solamente a los maestros. El Art. 3.14 de la Ley Núm. 68, *supra*, 3 L.P.R.A. sec. 393m, retiene este esquema de licencias para los maestros del salón de clase. También, expresamente dispone que aquel maestro del salón de clases que sea oficialmente nominado para uno de los cargos descritos *"quedará automáticamente relevado del servicio* a partir del primero (1ro.) de agosto del año electoral . . .". (Énfasis suplido.) Según los estatutos vigentes, los otros empleados públicos no tienen derecho a esta licencia especial ni quedan automáticamente relevados de

---

[4] La Sec. 6 de la Ley Núm. 25 de 3 de junio de 1960 (18 L.P.R.A. ant. sec. 249d) disponía que la concesión de licencias políticas con paga se otorgaría a los maestros del salón de clases oficialmente nominados "para un cargo de elección popular . . .". Por otro lado, el Art. 3.14 de la Ley Núm. 68 de 28 de agosto de 1990 (3 L.P.R.A. sec. 393m) limita la concesión de dichas licencias sólo a los maestros nominados para ciertos cargos electivos, incluso el de Gobernador, Comisionado Residente, Senador, Representante o Alcalde. Del historial legislativo se desprende que la razón principal para excluir a los nominados a Asambleístas Municipales fue principalmente económica. Por no estar ante nuestra consideración, en buena metodología adjudicativa y constitucional, no procede que evaluemos la validez de estas modificaciones de las candidaturas que son acreedoras a la licencia especial.

sus funciones al aceptar una candidatura para uno de estos cargos electivos.

Además, la controversia ante nos versa exclusivamente sobre la validez de la concesión legislativa de esta licencia para favorecer a un grupo de empleados públicos. Así las cosas, los demandantes apelados permanecen en la misma postura frente a la nueva ley. La aprobación de la Ley Núm. 68, *supra*, no pone fin a la controversia que dio fundamento al pleito original.

Por último, el dictamen del foro de instancia también ordenó la cancelación de todas las licencias autorizadas a partir del 1ro de enero de 1989. La nueva ley provee un procedimiento para las licencias solicitadas después de su aprobación y *no para las concedidas al amparo del estatuto anterior.* Para los maestros que actualmente están disfrutando de una licencia sin sueldo conferida bajo el estatuto anterior, la controversia no es académica porque esta licencia concedida al amparo de la Ley Núm. 25, *supra*, sería automáticamente revocada de prevalecer la sentencia apelada.

Por las razones expuestas anteriormente, resolvemos que la controversia sometida ante nos es justiciable y requiere nuestra oportuna adjudicación antes de los próximos comicios electorales. Si no se resuelve en esta ocasión, prevalecería la incertidumbre sobre la validez constitucional de las licencias con sueldo a los maestros candidatos a cargos electivos.

En estas circunstancias, procede decidir si la concesión de licencias con sueldo a los maestros del Sistema de Educación Pública que aspiren a cargos electivos viola la cláusula que garantiza la igual protección de las leyes de la Constitución del Estado Libre Asociado de Puerto Rico.

V

En nuestra jurisdicción existe abundante jurisprudencia interpretativa de la cláusula constitucional sobre igual protec-

878

ción de las leyes.[5] Esta disposición se activa cuando nos enfrentamos a una legislación o a una acción estadual que crea clasificaciones entre grupos, discriminando a unos frente a otros. Sin embargo, hemos señalado que no toda discriminación viola este precepto, ya que las normas que nutren este principio no exigen un trato igual para todos los ciudadanos, aunque sí prohíben un tratamiento desigual injustificado. *Zachry International v. Tribunal Superior*, 104 D.P.R. 267, 276–277 (1975). El fundamento de este precepto surge de la concepción básica de que para gobernar una sociedad tan compleja y variada, en la cual existen distintos intereses individuales y grupales, y diversas relaciones sociales, es necesario establecer clasificaciones.

> Por consiguiente, el problema central que plantea la aplicación de la igual protección de las leyes es el de diseñar normas que permitan al gobierno establecer clasificaciones pero que a la vez protejan a las personas contra desigualdades indebidas o irrazonables u odiosas (invidious).

> . . . . . . . .

> Por todas estas consideraciones, el principio cardinal en que se funda constitucionalmente la igual protección de las leyes es el de "trato similar para personas similarmente situadas". Véase R. Serrano Geyls, *Derecho constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1988, Vol. II, págs. 1081–1082.

De modo que en todo análisis sobre igual protección de las leyes tenemos que evaluar la relación entre el propósito que se quiere obtener y la clasificación utilizada por el Estado. También, se debe ponderar la importancia del derecho o del interés afectado por la actuación del Estado. Para hacer dicho análisis, la doctrina ha desarrollado el uso de diversos tipos de escrutinios judiciales para evaluar la constitucionalidad de una ley. En nuestra jurisdicción hemos utilizado dos (2) escrutinios: el estricto y el racional. *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64 (1983);

---

[5] "Ninguna persona será privada de su libertad o propiedad sin debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes." Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 275.

*Vélez v. Srio. de Justicia,* 115 D.P.R. 533 (1984); *Salas v. Municipio de Moca,* 119 D.P.R. 625 (1987); *P.I.P. v. C.E.E.,* 120 D.P.R. 580 (1988); *De Paz Lisk v. Aponte Roque,* 124 D.P.R. 472 (1989).

Para que se justifique la utilización del escrutinio riguroso o estricto, el tribunal tiene que identificar si la clasificación hecha afecta algún derecho fundamental de la persona o si establece alguna clasificación sospechosa que no guarde relación con la habilidad o aptitud de las personas afectadas por la clasificación. *Zachry International v. Tribunal Superior,* supra, págs. 276-277. Si se identifican esas clasificaciones, la legislación se presume inconstitucional y le corresponde al Estado probar la existencia de un interés apremiante que las justifique. Este Tribunal ha empleado el escrutinio estricto para analizar clasificaciones sospechosas o que afectan derechos fundamentales en innumerables ocasiones. Véanse, por ejemplo: *Com. de la Mujer v. Srio. de Justicia,* supra; *Zachry International v. Tribunal Superior,* supra, clasificación fundamentada en sexo; *Ocasio v. Díaz,* 88 D.P.R. 676 (1963); *García v. Acevedo,* 123 D.P.R. 624 (1989); *Almodóvar v. Méndez Román,* 125 D.P.R. 218 (1990), clasificación fundamentada en condición social y nacimiento; *De Paz Lisk v. Aponte Roque,* supra, extranjería; *Morales Morales v. E.L.A.,* 126 D.P.R. 92 (1990), clasificación que afectaba el derecho a la huelga; *Rodríguez Cruz v. Padilla Ayala,* 125 D.P.R. 486 (1990); *McCrillis v. Aut. Navieras,* 123 D.P.R. 113 (1989), clasificación fundamentada en ideas políticas; *León Rosario v. Torres,* 109 D.P.R. 804 (1980), clasificaciones tangentes a la dignidad humana.

El escrutinio tradicional mínimo se utiliza cuando la legislación impugnada no crea unas clasificaciones sospechosas o no afecta derechos fundamentales. En ese sentido, la clasificación tiene que ser razonable al situar a personas similares con respecto al propósito de la ley. Cuando se utiliza este escrutinio, la ley se presume constitucional si existe un mero nexo racional entre el propósito legislativo y la clasificación establecida. *La ley será constitucional siempre que razonablemente pueda concebirse una situación que justifique la clasificación. Vélez v. Srio. de*

*Justicia*, supra, pág. 538. El que impugna la legislación tiene el peso de la prueba de establecer que la clasificación es claramente arbitraria y que no se puede establecer nexo racional alguno. Íd. Al amparo de este trasfondo doctrinal, procede analizar la controversia de autos.

## VI

La clasificación que creó la Ley Núm. 25, *supra*, dividió a los maestros de los demás empleados públicos que no estaban cobijados por la legislación. Examinemos si esa clasificación viola la cláusula sobre igual protección de las leyes.

El foro de instancia utilizó un escrutinio estricto al evaluar la clasificación mencionada. Sin embargo, al hacerlo, no identificó si se afectaba un derecho fundamental o si la clasificación era sospechosa. Como paso inicial en nuestro análisis judicial, tenemos que señalar que el estatuto impugnado no genera clasificación sospechosa alguna ni afecta un derecho fundamental.

No es correcta la posición de los recurridos al señalar que la legislación afecta el derecho a ser candidato a un puesto público. En primer lugar, hemos establecido que el derecho a ser candidato a un cargo electivo no es un derecho fundamental. *García v. Luciano*, 115 D.P.R. 628, 630 (1984). Véase, también, *P.P.D. v. Planadeball Poggy*, 121 D.P.R. 570 (1988). Con fines ilustrativos, véase *Clements v. Fashing*, 457 U.S. 957, 963 (1982). En general, consúltese J.J. Álvarez González, *El derecho a acceso en la papeleta electoral en Puerto Rico: un análisis constitucional*, 50 Rev. Jur. U.P.R. 331 (1981). En segundo lugar, la clasificación que establece este estatuto no menoscaba ni prohíbe a los empleados públicos la capacidad ni la oportunidad de ser candidatos a puestos electivos. Ejemplo claro de esto es la situación de autos, donde todos los demandantes apelados, mientras eran empleados públicos, fueron candidatos en las elecciones de 1988 y dos (2) de ellos fueron electos y se encuentran desempeñando sus cargos. Por otro lado, el legislador concedió una licencia con paga

a una clase de empleado público que por disposición de ley tiene que automáticamente dejar de trabajar al aceptar la candidatura. Tanto la anterior legislación como el ordenamiento aprobado recientemente requieren de forma expresa que un maestro sea relevado de sus funciones al aceptar una candidatura para uno de los cargos descritos. *Los empleados públicos que originan esta controversia no tienen una restricción similar y pueden aceptar una candidatura y continuar trabajando en sus funciones regulares siempre que no utilicen su posición oficial para fines político-partidistas en violación a la Ley de Personal del Servicio Público de Puerto Rico*, 3 L.P.R.A. sec. 1371(2).

La medida legislativa tiene el propósito dual de evitar que un maestro tenga que dejar de trabajar al aspirar a cargos electivos y, simultáneamente, se quiere evitar la contaminación del Sistema de Educación Pública con la política partidista. *No se trata de una restricción de acceso a la papeleta electoral para una clase de candidatos, sino de un incentivo gubernamental para facilitar ese acceso a los maestros.* Véase J.J. Álvarez González, *Derecho Constitucional*, 59 (Núm. 2) Rev. Jur. U.P.R. 247, 257 esc. 52 (1990). Al no tratarse de una clasificación sospechosa ni de derechos fundamentales de los demandantes apelados, la controversia de autos debe evaluarse a la luz de un escrutinio tradicional mínimo. [6]

Por ser este tipo de legislación un área que compete a las otras ramas del Estado, nuestra facultad de interpretar la Constitución del Estado Libre Asociado y las leyes del país no debe extenderse a evaluar la sabiduría o los beneficios públicos de esta legislación. Tampoco debemos ceder a la tentación de revisar los criterios utilizados por las otras ramas del Gobierno al formular la

---

[6] En *Pacheco v. Srio. Instrucción Pública*, 108 D.P.R. 592, 601 (1979), se examinó la constitucionalidad de la Ley Núm. 25, *supra*. Sin embargo, en *dicta* expresamos que cuando se crea un privilegio para una clase en particular debe utilizarse el escrutinio estricto. No debemos pasar por alto que en aquel caso, *a diferencia del caso ante nos*, se trataba de clasificaciones entre la misma clase magisterial y no de clasificaciones entre clases distintas entre sí.

política pública y al establecer las prioridades fiscales. Sólo nos corresponde determinar si existe una mínima racionalidad que sostenga el propósito del estatuto. Debemos hacer este análisis con un criterio que estime la difícil tarea legislativa de establecer las prioridades presupuestarias y que sea compatible con la tendencia judicial de prudencialmente no intervenir en asuntos relacionados con el uso de fondos públicos y con la reglamentación de la economía.

> El estrepitoso fracaso del Tribunal Supremo federal en las primeras cuatro décadas de este siglo, demostró que estas áreas no son de la particular pericia del poder judicial y que la Constitución no debe utilizarse para interferir con la actividad legislativa en ellas. Álvarez González, *Derecho Constitucional,* supra, pág. 255.

Además, no olvidemos que en nuestro sistema democrático el legislador continuamente tiene que establecer clasificaciones entre personas y grupos, y que es imposible gobernar en el estado moderno sin esta facultad. "Si la igual protección de las leyes rigiera literalmente, es obvio que no se podría gobernar." Serrano Geyls, *op. cit.,* pág. 1081.

## VII

La Ley Núm. 25, *supra,* fue una medida que culminó los esfuerzos del magisterio puertorriqueño por eliminar las prohibiciones absolutas de actividades políticas de los maestros contenidas en la Ley Escolar Compilada de Puerto Rico de 12 de marzo de 1903, según enmendada. Ese estatuto obligaba a los maestros, que fuesen nominados a un cargo público de elección popular, a "'*renunciar inmediatamente su cargo en el magisterio*'". (Énfasis suplido.) 1925 Leyes de Puerto Rico 579. Preocupados porque esta ley menoscababa la libertad de pensamiento y de expresión de los maestros, la Comisión de Derechos Civiles recomendó que se les reconociera su derecho a participar en la contienda electoral. Para evitar el uso indebido de su posición, se sugirió la concesión de licencias con sueldo a los que aspiraran a cargos electorales. Informe del Comité del Gobernador (1959-CDC-001)

de agosto de 1959, Comisión de Derechos Civiles, en *Informe de la Comisión de Derechos Civiles del Estado Libre Asociado de Puerto Rico*, New Hampshire, Ed. Equity, 1973, T. 1, pág. 46.

En su próxima sesión ordinaria, la Asamblea Legislativa aprobó la Ley Núm. 25, *supra*. Del extenso historial legislativo de la medida se desprende que su propósito fue colocar a los maestros "en igualdad de condiciones con los demás ciudadanos . . .". 18 L.P.R.A. sec. 249a n. En particular, los legisladores querían eliminar la prohibición absoluta a los maestros a aspirar a cargos electivos que contenía la anterior legislación. Ellos sabían que una prohibición análoga se extendía solamente a los jueces, Art. V, Sec. 12 de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1; a los policías, 25 L.P.R.A. sec. 1024(a) y (b), y también a algunos empleados públicos que trabajaban en otras entidades del Gobierno de Puerto Rico que estaban estrechamente vinculadas con agencias federales cubiertas por la Ley Hatch, 5 U.S.C. sec. 1501 *et seq.* [7] *El resto de los empleados públicos podía postularse para algún cargo electivo y podía continuar trabajando sin tener que renunciar o solicitar una licencia sin sueldo.*

Para corregir los males de la legislación anterior, el estatuto reconoce el derecho de los maestros de las escuelas públicas "a participar en cualquier momento u ocasión en campañas y actividades políticas, a ser candidatos para cargos públicos electivos o de nombramiento, y a defender sus propias candidaturas o la candidatura de cualquier otra persona". 18 L.P.R.A. sec. 249b.

Sin embargo, para evitar el proselitismo político en las aulas, la medida requiere que durante las horas de clases los maestros se abstengan de ejercer los derechos que se le han reconocido. Para garantizar el más estricto cumplimiento con estas normas, se *releva automáticamente* a un maestro de su cargo cuando sea "oficialmente nominado para un cargo de elección popular" y

---

[7] Entre los empleados con prohibiciones análogas se encuentran los de la División de Rehabilitación Vocacional, 18 L.P.R.A. sec. 1060; los de la Administración del Servicio de Empleo, 29 L.P.R.A. sec. 563, y los de la Ley de Seguridad del Empleo, 29 L.P.R.A. sec. 713(f). Véase *Hermina González v. Srio. del Trabajo*, 107 D.P.R. 667 (1978).

simultáneamente se le conceda una "licencia especial con paga al maestro concernido . . .". 18 L.P.R.A. sec. 249d.

█ Por el hecho de que, a diferencia de los demás funcionarios públicos, los maestros no pueden ejercer las funciones de su cargo mientras están activos en la política, los legisladores decidieron brindarle un tratamiento distinto muy a tono con sus particularidades profesionales. Al así hacerlo, reconocieron que la labor de los maestros es de amplia dedicación y preparación. Constantemente tienen que estar elaborando los planes diarios de enseñanza que normalmente sólo pueden ser confeccionados por las noches o en sus días libres. También, continuamente tienen reuniones relacionadas con la educación, la preparación y la recreación de los estudiantes. De igual forma, en cada distrito escolar se celebran múltiples actividades educativas en las cuales la participación del maestro es de vital importancia para el desarrollo de sus estudiantes.

La naturaleza de la función educativa requiere que los maestros utilicen gran parte de su tiempo libre para atender estas responsabilidades inherentes al magisterio. De ahí que los legisladores hayan tenido que diseñar para los maestros un esquema distinto al que tienen los demás funcionarios públicos. De esta forma no se afecta adversamente su función educativa con los niños puertorriqueños. Sobre este extremo es particularmente relevante el intercambio que sostuvieran varios legisladores con la Presidenta de la Asociación, Sra. María Arroyo de Colón:

SEÑOR ROMAN BENITEZ: Yo quería hacerle unas preguntas. Cuando usted dice que le preguntó a unos grupos políticos sobre esta sección 6, que ellos entendieron que esto constituía un privilegio, al ellos decir que entendieron que constituía un privilegio, ¿lo hacían comparando la situación del maestro con ellos, o comparando la situación del maestro con otros empleados públicos que pueden ser candidatos y que no van a tener la ventaja de la licencia con sueldo?

SEÑORA ARROYO DE COLON: Yo no hablé con otros empleados del Gobierno. Hablé con doctores, enfermeras. Les pregunté si les gustaba la política. S[i] ejercían su derecho a [la] política

plenamente. Algunos, hablé con algunos agricultores y hablé con algunos comerciantes. Mi marido es comerciante y en una reunión de comerciantes que tuvieron que él asistió, yo lo acompañé y les hice esa pregunta a un grupito como de 10 ó 12, mientras almorzábamos.

Y ellos no compararon con los demás empleados del gobierno. Ellos compararon con ellos. Dijeron que ellos, como políticos, cuando iban a defender sus candidaturas no tenían una asignación del Gobierno para dedicar su tiempo a defender las candidaturas. Yo les dije que tampoco el Gobierno tenía una ley que los obligaba a cerrar las tiendas, a entregarle la finca a otro. *Que eso era una característica del magisterio porque estábamos bregando con mentes y almas de niños, y eso, pues, es una cosa sagrada, y el pueblo tiene que proteger a los niños, de que pueda el maestro estar defendiendo su candidatura y el niño sin clases.*

SEÑOR CONCEPCION DE GRACIA: . . . De modo que lo que hay que considerar es el balance de conveniencias también para la escuela pública. Si es conveniente para la escuela pública garantizarle a él el derecho a defender su candidatura y de mantenerse en la escuela, o si es más conveniente facilitarle a él los medios para él defender su candidatura fuera de la escuela.

SEÑOR ROMAN BENITEZ: Donde vamos a encontrar objeción es en esto. Yo estoy a favor de la medida en esa forma, pero estoy viendo lo que nos van a decir, las objeciones que van a venir. Entonces será ésa de que otros empleados públicos van a estar limitados porque no tienen la ventaja de la licencia con sueldo. Para eso es que yo estoy tratando de conseguir cómo defenderme de eso. Cómo defender mi punto de vista sobre eso.

SEÑORA ARROYO DE COLON: Los empleados públicos acumulan licencia, pero además están bregando con materiales, con oficinas, con otras cosas, *que no están bregando con niños. Y el Gobierno puede permitir que esos empleados públicos pudiera permitir cualquier gobierno, estén en sus funciones y que por la noche vayan a un mitin a defender su candidatura.* Pero en el magisterio no porque el maestro da sus clases hasta las 4:00 de la tarde. Desde las 7:00 que se va de su casa ó las 7 1/2, y entonces después que va y se baña y come y atiende a su familia, *entonces tiene que sentarse a escribir los planes, preparación de la lección del otro día. No puede irse a la noche y seguir siendo maestro, por eso, porque tiene que irse.*

. . . . . . . . .

SEÑORA PRESIDENTA:

. . . . . . . .

De modo que en ese terreno, señora Presidenta y compañeros, el argumento se cae por su propio peso. El servicio requiere, el servicio público requiere que esas personas participen en la política activa porque reconocidamente tiene más talento que el promedio del pueblo de Puerto Rico de donde a veces se sacan los candidatos. *La escuela pública por otro lado, requiere la garantía de que el maestro que está frente al salón de clases no tiene la preocupación que a las 4:00 de la tarde hay un mitin en Bucarabones y tiene que irse para allá. Los niños necesitan la protección y la garantía.* De modo que lo que un señor podría decir que es un privilegio para un maestro, es un derecho y una garantía para la escuela pública y para esos niños. (Énfasis suplido.) *Vista pública sobre el P. del S. 249 y P. de la C. 718*, Comisión de Instrucción del Senado de Puerto Rico, 25 de marzo de 1960, págs. 35–37.

Al aprobar esta legislación, la Asamblea Legislativa ratificó "que la función magisterial ocupa un lugar importante en nuestra escala de valores sociales", *De Paz Lisk v. Aponte Roque*, supra, pág. 488, y resolvió la disyuntiva de que el reconocimiento de los derechos constitucionales de este grupo pudiese menoscabar los derechos de los estudiantes a recibir una educación "libre y enteramente no sectari[a]". Art. II, Sec. 5, Const. E.L.A., *supra*, ed. 1982, pág. 271.

En sus deliberaciones la Comisión se ha preocupado por salvaguardar en esta medida dos valores básicos de nuestra democracia. *Nos referimos en primer lugar al principio de la igualdad de los derechos civiles, que debe imperar sin condiciones de clase alguna, y en segundo lugar el derecho imprescriptible, inviolable y sagrado del estudiante a recibir la enseñanza sin adulteraciones procedentes de la parcialidad política del maestro.* Esta doble preocupación ha presidido la redacción del proyecto. (Énfasis suplido.) Informe de la Comisión de Instrucción de la Cámara de Representantes sobre el P. de la C. 718 de 19 de febrero de 1960, pág. 2.

Con esos propósitos rectores, los legisladores aprobaron el esquema de licencia con sueldo a los maestros candidatos a cargos electivos. Con ese diseño, además de subsanar el hecho de que el maestro queda relevado automáticamente de sus funciones

cuando acepta una candidatura, se le garantiza a este grupo el sustento de vida hasta que transcurran los comicios. Para satisfacer ese interés gubernamental, había que diseñar un esquema que evitara el éxodo de los maestros hacia otras actividades, garantizándole también seguridad de empleo. Finalmente, la legislación también persigue el interés de estimular a los maestros a aportar su experiencia y su talento en el proceso electoral y en la administración de los gobiernos estatales y municipales.

## VIII

Hemos expuesto que durante todo el historial legislativo permeó el deseo de armonizar el derecho a la educación de los niños y el derecho de los maestros a participar en los procesos electorales del país. El legislador entendió que proveyéndole unos mecanismos adecuados al maestro para vindicar su derecho sin que se afectara la educación de los niños armonizaba el conflicto de intereses. El andamiaje de estas licencias especiales guarda un nexo racional con el propósito legislativo, y la clasificación creada no afecta derechos fundamentales de aquellos que están excluidos ni los relega arbitrariamente a un plano de inferioridad. Los demandantes apelados no han logrado probar la arbitrariedad de la legislación que impugnaron. *Es perfectamente legítimo que el proceso legislativo haya decidido que conviene a los mejores intereses del país estimular a la clase magisterial a que participe en el proceso gubernamental tanto para el beneficio del Estado como para salvaguardar el derecho de los estudiantes a recibir una educación adecuada.* Independientemente de nuestras preferencias personales sobre esta medida, lo cierto es que el juicio legislativo merece deferencia en la formulación de la política pública.[8]

---

[8] A través de los años, la ley ha sido revisada para efectuar cambios que, según el entendimiento del legislador, responden al balance de los intereses en juego. La tendencia va dirigida a limitar la duración y el alcance de la concesión de licencias con sueldo. Es a la Legislatura y no a este Tribunal a quien le corresponde determinar el uso más adecuado de los fondos públicos. Véase *P.I.P. v. C.E.E.*, 120 D.P.R. 580 (1988).

Por los fundamentos que hemos expuesto, *resolvemos que la Sec. 6 de la Ley Núm. 25, supra, no viola la cláusula constitucional de la igual protección de las leyes. Procede revocar el dictamen del foro de instancia. Se dictará sentencia en conformidad con lo aquí expuesto.*

Los Jueces Asociados Señores Negrón García y Rebollo López emitieron opiniones disidentes.

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

I

*Introducción: importancia para la democracia y para nuestro sistema constitucional*

*NUEVAMENTE* ESTE RECURSO "REVIVE EN NUESTRO SUELO LA CONCEPCIÓN PLATÓNICA —ABANDONADA EN EL TRANSCURSO DE LA HISTORIA DE LA CIVILIZACIÓN— DE QUE SÓLO LOS 'FILÓSOFOS REYES' SON LOS MÁS APTOS PARA GOBERNAR Y EDUCAR. LAS VOCES QUE SOSTIENEN HOY [QUE LOS MAESTROS DEL SISTEMA DE EDUCACIÓN PÚBLICA, PER SE, SON ACREEDORES AL PRIVILEGIO DE UN SUELDO, SIN TRABAJAR, PARA POLÍTICAMENTE LOGRAR ACCESO A UN CARGO PÚBLICO], *OLVIDAN* QUE EN NUESTRO DISEÑO DEMOCRÁTICO LA *'IGUALDAD ES INGREDIENTE MEDULAR DEL IDEAL DE JUSTICIA QUE CONSTANTEMENTE LATE EN LA CONSTITUCIÓN'. P.R.P. v. E.L.A.*, 115 D.P.R. 631, 633 (1984)". (Énfasis suplido.) *Vicéns v. U.P.R.*, 117 D.P.R. 771, 772 (1986). Y por segunda vez "el Poder Judicial *refrenda* una PRÁCTICA ELITISTA, en *menosprecio* de la dignidad e igualdad del ser humano, que desde el 1952 la *Asamblea Constituyente rechazó expresamente*". (Énfasis suplido.) Íd., pág. 783.

Cuando las determinaciones de hecho del Tribunal Supremo se *apartan de la realidad, las normas adheridas a esas determinaciones se convierten en sospechosas*. El estudio empírico impone un freno muy especial sobre el proceso decisorio judicial al clarificar las premisas de hecho en que se fundamenta el juicio legal. Si en virtud del estudio empírico el tribunal descansa en un *fundamento fáctico inexistente*, tiene entonces que escoger uno alterno para apuntalar la norma o sufrir los dardos y las flechas del comentario crítico. Si para evitar parecer ignorante de los hechos, el tribunal decide reafirmar el resultado y transformar la norma legal, debe elaborar un fundamento alterno para apoyar su decisión. Al no poder convenientemente esculpir los hechos en cada caso, el tribunal es más responsable de su decisión. Esta responsabilidad restringe su *discreción constitucional*. (Traducción nuestra y énfasis suplido.) D.L. Faigman, *"Normative Constitutional Fact Finding": Exploring the Empirical Component of Constitutional Interpretation*, 139 U. Penn. L. Rev. 612–613 (1991).

Con estas observaciones en mente, de entrada, en buena técnica judicial dispositiva, expongamos sucinta pero ordenadamente las premisas de hechos y las premisas jurídicas que sirven de andamiaje a la opinión mayoritaria suscrita por el Juez Asociado Señor Hernández Denton. Lo hacemos, pues algunas están dispersas y, otras, entremezcladas o inmersas con expresiones genéricas jurídicas. Así podremos examinar mejor su *veracidad, sustancia, incorrección* o *superficialidad*. "Ningún tribunal puede comprometerse a decidir la validez de una legislación mediante una simple comparación entre sus disposiciones y las de la Constitución que sea aplicable; primero debe conocer *la veracidad de las determinaciones de hecho* que postula el estatuto o con respecto a las cuales dicho estatuto se va a aplicar. . . ." (Traducción y énfasis nuestros.) H.W. Biklé, *Judicial Determination of Questions of Fact Affecting the Constitutional Validity of Legislative Action*, 38 Harv. L. Rev. 6 (1924).

*La primera premisa es que el recurso no se ha tornado académico con la aprobación de la nueva Ley Orgánica del Departamento de Educación del Estado Libre Asociado de Puerto Rico (Ley Orgánica del Departamento de Educación),*

*Ley Núm. 68 de 28 de agosto de 1990, según enmendada,* 3 L.P.R.A. sec. 391 *et seq.*

Dos (2) conclusiones jurídicas nutren esta premisa mayoritaria: la controversia es *recurrente* y la *nueva ley no la resuelve.* En términos fácticos reconocen que los demandantes apelados Berberena *et al.* "pueden aspirar a una *nueva candidatura* en elecciones *futuras*", e igualmente *otros* empleados públicos pueden "solicit[ar] licencias con sueldo". (Énfasis suplido.) Opinión mayoritaria, pág. 866. También aluden al "poco tiempo que transcurre entre la certificación de una candidatura y el día de las elecciones"; a la "*alta* probabilidad de que el asunto no pueda resolverse *finalmente antes* de que se celebren los comicios", y que "esta controversia es capaz de *evadir* la revisión judicial". (Énfasis suplido.) Íd.

En cuanto a los efectos de la nueva legislación, afirman que ahora, "al adjudicar la controversia se toma en consideración que la ley se aplicará *no como estaba antes, sino como está luego de enmendada*". (Énfasis suplido.) Opinión mayoritaria, pág. 866. Este enfoque de revisión se reafirma más adelante: "En ese caso, *la controversia sigue viva* y requiere la adjudicación del foro apelativo. Entonces, *la determinación del foro de instancia debe revisarse a la luz de la ley tal y como se encuentra actualmente, no como estaba al momento de la adjudicación en primera instancia.*" (Énfasis suplido.) Íd., pág. 867.

Finalmente, la mayoría hace dos (2) importantes determinaciones: *primero*, "que el esquema de licencias con sueldo a maestros que sean candidatos a ciertos puestos electivos, que fuera declarado inconstitucional por el tribunal de instancia, fue *ratificado recientemente* por la Asamblea Legislativa y *continúa siendo un beneficio concedido únicamente a la clase magisterial*", (énfasis suplido) opinión mayoritaria, pág. 870, y *segundo*, "que la controversia sometida ante nos es *justiciable* y *requiere nuestra oportuna adjudicación antes de los próximos comicios electorales. Si no se resuelve en esta ocasión, prevalecería la incertidumbre sobre la validez constitucional de las*

*licencias con sueldo a los maestros candidatos a cargos electivos*". (Énfasis suplido.) Íd., pág. 872.

La *segunda premisa* es que la cláusula constitucional sobre la igual protección de las leyes "se *activa* cuando nos enfrentamos a una legislación o a una acción estadual que *crea clasificaciones* entre *grupos, discriminando a unos frente a otros*". (Énfasis suplido.) Opinión mayoritaria, pág. 872. En abono de esta premisa jurídica, nos dicen que esta disposición prohíbe "un tratamiento desigual injustificado" y protege "'contra desigualdades indebidas o irrazonables u odiosas . . .'", íd., págs. 872–873.

La *tercera* premisa es que la ley no genera clasificación sospechosa alguna ni afecta un derecho fundamental. Opinión mayoritaria, pág. 872. Tampoco *menoscaba* la *capacidad ni la oportunidad* de los demandantes apelados Berberena *et al.* a ser candidatos. Íd. Bajo esta última premisa, sin mucho análisis, dan un salto conceptual; reducen la *ecuación a un simple problema económico* y aplican el *escrutinio tradicional mínimo.* Íd., pág. 876.

La *cuarta* premisa es que, con vista a este escrutinio mínimo, justifican la licencia política con sueldo —*aun cuando no hay prueba alguna en el récord*— a base de varios *supuestos* hechos. Según ellos, los maestros utilizan su tiempo libre —suponemos que todo o parte sustancial— para atender responsabilidades inherentes al cargo. Afirman que los maestros "[c]*onstantemente tienen* que estar elaborando los planes *diarios* de enseñanza que normalmente sólo pueden ser confeccionados por las *noches* o en sus *días libres*. También, *continuamente* tienen reuniones *relacionadas* con la educación, la preparación y la recreación de los estudiantes. De igual forma, en cada distrito escolar se celebran *múltiples actividades* educativas en las cuales la participación del maestro es de *vital importancia* para el desarrollo de sus estudiantes". (Énfasis suplido.) Opinión mayoritaria, pág. 879. Además, nos dicen que esta licencia es para *evitar* que los maestros políticos *contaminen* al estudiantado y para "*subsanar* el hecho de que . . . queda[n] relevado[s] . . . cuando *acepta[n* las] candidatura[s] . . .". Íd., pág. 881.

La mayoría admite que la "legislación *también persigue* el interés de *estimular a los maestros a aportar su experiencia y su talento en el proceso electoral y en la administración de los gobiernos estatales y municipales*". (Énfasis suplido.) Opinión mayoritaria, pág. 881. Por último, concluyen que es "*perfectamente legítimo que el proceso legislativo haya decidido que conviene a los mejores intereses del país estimular a la clase magisterial a que participe en el proceso gubernamental tanto para el beneficio del Estado como para salvaguardar el derecho de los estudiantes a recibir una educación adecuada*". (Énfasis en el original.) Íd., pág. 882.

En esencia, lo expuesto es una cápsula de las premisas jurídicas, de las conclusiones fácticas y de los pronunciamientos de la opinión mayoritaria. *Coincidimos con las primeras dos (2) premisas, a saber: que el recurso no es académico y en cuanto a los dos (2) escrutinios a utilizarse bajo la cláusula sobre igual protección de las leyes. Sin embargo, rechazamos las restantes.* Demostraremos que esas premisas son incorrectas; se fundamentan en hechos no probados o en hechos que no son verdaderos. La inconstitucionalidad, tanto bajo un escrutinio estricto como bajo el de nexo racional, es un imperativo. Acometamos la tarea.

II

*Principios constitucionales aplicables*

Las Secs. 1 y 5 del Art. II de *nuestra Constitución*, L.P.R.A., Tomo 1, ed. 1982, págs. 257 y 271, disponen, en lo pertinente:

La dignidad del ser humano es inviolable. *Todos los hombres son iguales ante la Ley.* No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o *condición social, ni ideas políticas* o religiosas. *Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana.*

Toda persona tiene derecho a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del *respeto de los derechos del hombre y de las libertades fundamentales.* (Énfasis suplido.)

Notamos el principio *espiritual* inmerso en nuestra Constitución de que "[t]oda persona tiene el *derecho de acceso, en condiciones de igualdad,* a las funciones públicas de su país". (Énfasis suplido.) A. Truyol y Serra, *Los derechos humanos: declaraciones y convenios internacionales,* Madrid, Ed. Tecnos, 1982, Parte I, Art. 21(2), pág. 66. ¿CÓMO PUEDE CONSTITUCIONALMENTE EL SISTEMA DE INSTRUCCIÓN PÚBLICA ENCARNAR "ESTOS PRINCIPIOS DE IGUALDAD HUMANA" SI POR LEY[1] IRÓNICAMENTE SE CREA UN PRIVILEGIO A FAVOR DE SUS INTEGRANTES, LOS CUALES, A SU VEZ, ESTÁN LLAMADOS A RESPETAR ESE POSTULADO? EN ESTAS CIRCUNSTANCIAS, ¿CÓMO PRETENDER QUE EL MAGISTERIO *PREDIQUE, SIN HIPOCRESÍAS, ESE MENSAJE DE IGUALDAD HUMANA*?[2]

*No obstante este precioso testamento constitucional, desde 1960 sus herederos (legisladores) han venido dándole un trato especial y favoritista —de tipo elitista— al magisterio de las escuelas públicas del país.* Todo fundamentado en la *cuestionable* teoría de que "el servicio público requiere que esas personas participen en la política activa *porque reconocidamente tiene[n] más talento que el promedio del pueblo* de Puerto Rico de donde a veces se sacan los candidatos". (Énfasis suplido.) *Vista pública sobre el P. del S. 249 y P. de la C. 718,* Comisión de Instrucción del Senado de Puerto Rico, 25 de marzo de 1960, pág. 37.

---

[1] Sec. 6 de la Ley Núm. 25 de 3 de junio de 1960 (18 L.P.R.A. ant. sec. 249d.

[2] El legajo de la Convención Constituyente es profuso en cuanto al *repudio* a privilegios, a distinciones y a diferencias injustificadas, *incluso las esgrimidas en abono del sistema de instrucción pública.* El Presidente de la Comisión de la Carta de Derechos, delegado Jaime Benítez —reputado educador y jurista— plasmó así ese sentir:

"Sr. BENÍTEZ: Más adelante, en las líneas quinta, sexta y séptima, se establece que 'tanto las *leyes* como el *sistema de instrucción pública* encarnarán estos *principios de esencial igualdad humana'*, y lo que se ha establecido aquí son ciertos principios básicos y esenciales que tienen fuerza *ex proprio vigore,* pero que además de tener fuerza por su propio vigor habrán de requerir implementación de dos clases, educativa y jurídica. En lo que toca a la educativa, ya hay aquí un mandato al sistema de instrucción pública que *habrá de respetar* estos básicos principios. *En lo que respecta al sistema jurídico y en esto se refiere a la totalidad de la estructura legal del país, se subraya la inconstitucionalidad de todo favoritismo.* Y todo reconocimiento a distinción habrá de estar motivado por mérito, por virtud, por esfuerzo, por talento." (Énfasis suplido.) 2 Diario de Sesiones de la Convención Constituyente 1382 (1952).

El Tribunal, por voz del Juez Asociado Señor Hernández Denton, lamentablemente se hace eco de esa controversial hipótesis de *"superioridad intelectual"*, recientemente plasmada como un "reconocido interés" en el Informe de la Comisión Especial Conjunta para la Reforma Educativa Integral de 5 de julio de 1990, págs. 17–18. A la licencia política pagada, la opinión mayoritaria le llama, eufemísticamente, "incentivo gubernamental para *facilitar* ese acceso [a la política] a los maestros" —(énfasis en el original suprimido y énfasis suplido) íd., pág. 876— *CARACTERIZACIÓN QUE IMPLICA UNA CLARA ADMISIÓN DE QUE ESTAMOS ANTE UN PRIVILEGIO QUE EL PROPIO GOBIERNO LE NIEGA A SUS OTROS FUNCIONARIOS Y EMPLEADOS PÚBLICOS, POR NO DECIR AL RESTO DE LA CIUDADANÍA.*

HOY, TRES (3) DÉCADAS DESPUÉS, LAS CONSECUENCIAS DE ESTE PRIVILEGIO PARA NUESTRA DEMOCRACIA Y SISTEMA EDUCATIVO PÚBLICO DEMUESTRAN SU IMPERMISIBILIDAD CONSTITUCIONAL. Expliquémoslas.

Para las elecciones de 1988 —del total de mil setenta y cuatro (1,074) puestos disponibles para asambleístas municipales, según la Ley Orgánica de los Municipios de Puerto Rico y las cifras poblacionales del último censo, 21 L.P.R.A. sec. 3052— SE POSTULARON MÁS DE SEISCIENTOS CINCUENTA (650) MAESTROS, ESTO ES, APROXIMADAMENTE UN *SETENTA POR CIENTO* (70%) DE LOS CANDIDATOS.[3] De éstos, fueron electos *más* de doscientos (200), lo que equivale a un veinte por ciento (20%). ESTA MASIVA POSTULACIÓN ES EL RESULTADO DIRECTO DE LAS LICENCIAS CON SUELDO O SUBSIDIOS ELECTORALES Y *ATENTA CONTRA LOS PRINCIPIOS DE IGUAL ACCESO Y REPRESEN-*

---

[3] Esta numerosa nominación no es un fenómeno reciente. Para 1976, el Departamento de Instrucción Pública estimaba que "en estas elecciones habr[ía] alrededor de 800 maestros candidatos a puestos electorales, lo cual le costar[ía] alrededor de tres millones de dólares en sueldos". *Pacheco v. Srio. Instrucción Pública*, 108 D.P.R. 592 (1979), Caso Núm. R-76–278, Solicitud de revisión, pág. 8.

*TACIÓN EN QUE SE FUNDA NUESTRO SISTEMA ELEC-TORAL Y NUESTRA DEMOCRACIA.*

*ES EVIDENTE QUE POR AÑOS, MEDIANTE ESTA LEGISLACIÓN, EL GOBIERNO HA ASUMIDO ACTIVA-MENTE UN ROL DE DIRIGISMO QUE NO LE CORRES-PONDE.* De ese modo ha logrado *estimular, canalizar y mono-polizar sustancialmente* las candidaturas a las asambleas municipales del país con una clase, según se alega, *especialmente cualificada para ese cargo. ¿CABE EN UNA VERDADERA DEMOCRACIA LA TESIS OFICIALISTA DE QUE LA CLASE MAGISTERIAL TIENE MÁS TALENTO Y ESTÁ MEJOR CAPACITADA PARA GOBERNAR?* Si es así, ¿quién lo decidió? ¿Qué hechos lo apoyan? ¿Qué estudio empírico o científico lo avala? *¿Por qué no estimular la participación electoral de otras clases profesionales, tales como los trabajadores sociales, los oficiales probatorios, los ingenieros o los abogados, que también se desempeñan en el sector público?*

Si la respuesta es en la negativa, ¿cómo entonces sostener que, constitucionalmente, puede *favorecerse económicamente a una clase profesional en particular* con miras a fomentar su *predo-minio y control gubernamental? NO IMPORTA CUÁN LOA-BLE HAYA SIDO ESE PROPÓSITO —E INDEPENDIENTE-MENTE DE LA VALIDEZ DE ESA VISIÓN ELITISTA DE SUPERIORIDAD MAGISTERIAL— ELLO ES CONSTITU-CIONALMENTE INTOLERABLE.*

En el *ámbito presupuestario* estimamos, conservadoramente, que desde 1960 *el drenaje* de fondos para subsidiar las campañas políticas de maestros ha *SOBREPASADO* LA CIFRA DE *CIN-CUENTA MILLONES* (50,000,000). *ES UN ABUSO. El cargo de maestro existe para servir a los estudiantes y no a la inversa.* DESTINAR *PARA FINES POLÍTICO-PARTIDISTAS* POCO O MUCHO DEL PRESUPUESTO DEL DEPARTAMENTO DE INSTRUCCIÓN PÚBLICA ES APARTARSE DE ESE PROPÓSITO CARDINAL Y DEL MANDATO CONSTITU-CIONAL DE QUE EL SISTEMA DE INSTRUCCIÓN PÚ-

BLICA DEBE ENCARNAR EL PRINCIPIO DE *IGUALDAD HUMANA.*

## III

*Inconstitucionalidad del diseño estatutario*

En su afán por sostener la constitucionalidad de la Sec. 6 de la Ley Núm. 25 de 3 de junio de 1960 (18 L.P.R.A. ant. sec. 249d), la mayoría reconoce un nexo racional que, si alguna vez pudo haber existido, queda derrotado por las enmiendas recientes. Aunque no cuestionamos el resumen doctrinario del escrutinio tradicional mínimo, conviene analizar más profundamente el requisito de que "la clasificación tiene que ser razonable al situar a personas similares con respecto al propósito de la ley". Opinión mayoritaria, pág. 874.

Por todos es conocido que, en sana metodología decisoria, una vez se identifica un propósito gubernamental legítimo, la clasificación debe razonablemente adelantar dichos propósitos. La relación clasificación-propósito se puede manifestar de cinco (5) formas:

Primero, la clasificación puede ser perfecta en la medida en que trata a todas las personas similares de manera similar. Segundo, la clasificación puede ser totalmente imperfecta debido a que escoge exactamente, la clase equivocada para una carga o mientras excluye la clase de personas que están relacionadas con el propósito legítimo del estatuto. Tercero, la clasificación puede que no sea lo suficientemente abarcadora en el sentido de que incluye un número pequeño de personas a las cuales aplica el propósito del estatuto pero excluye a algunos que están en una situación similar. Cuarto, la clasificación puede que sea demasiado abarcadora en el sentido en que trata de manera similar no sólo a las personas cuyas características se relacionan de manera similar con el propósito de la ley, sino también a otras personas que no comparten esas características distintivas legítimas. Quinto, puede haber una proporción mixta de insuficiencia y exceso de inclusión. (Traducción nuestra.) J.E. Nowak, R.D. Rotunda y J.N. Young, *Constitutional Law*, 2da ed., Minneapolis, Ed. West Publishing Co., 1983, pág. 588.

De todas estas clasificaciones, resulta de particular relevancia la categoría de subinclusiva (*under-inclusive*). Ésta clasifica a las personas situadas en un mismo plano pero excluye a otras igualmente situadas en términos de los propósitos de la ley. Nowak, Rotunda y Young, *op. cit.* Así, una clasificación es subinclusiva cuando excluye de los beneficios a personas que, según los propósitos de la ley, también serían acreedores a los mismos.

La nueva *Ley Orgánica del Departamento de Educación*, si bien mantiene los subsidios para maestros que aspiran a la gobernación, a Comisionado Residente, a la Legislatura y a las alcaldías, los ELIMINA EN CUANTO A MAESTROS CANDIDATOS A ASAMBLEÍSTAS. Como razón, se adujo que *"provocan un serio disloque de las tareas docentes* debido a que se ha comprobado que *más de 600 maestros se ausentan* de sus clases por virtud de esta licencia. En términos económicos envuelve [é]st[a] *sobre 14 millones de dólares que podrían utilizarse para compra de materiales y libros que tanto se necesitan"*. (Énfasis suplido.) Informe de la Comisión de Educación del Senado de Puerto Rico de 28 de febrero de 1990, págs. 50–51.

Vemos que la nueva ley otra vez separa a los maestros del Sistema de Educación Pública del resto de los empleados públicos. La mayoría justifica la clasificación con el propósito legítimo de despolitizar las escuelas y pretende, además, utilizar *OBJETIVOS ILEGÍTIMOS*, tales como la supremacía magisterial y facilitar su campaña al no exponerlos a trabajos extracurriculares.

No es necesario profundizar para entender que, eliminando este privilegio a los maestros candidatos a asambleístas, SE RECRUDECE LA IRRACIONALIDAD DE LA CLASIFICACIÓN Y SE DEMUESTRA LA INCONSTITUCIONALIDAD DEL ESTATUTO. *Con esa acción, la Asamblea Legislativa dio al traste y echó por la borda la justificación tradicional —o excusa— en que se ha apuntalado la licencia*: proteger a los estudiantes de la contaminación político-partidista de sus maestros durante los meses previos a las elecciones. 13 Diario de

Sesiones de la Asamblea Legislativa (Ordinaria) 317–318 (1960). Nos explicamos.

Estos maestros políticos —aspirantes a las asambleas municipales— tendrán *también* que defender y promover sus candidaturas fuera de las aulas. *POR POCO ESFUERZO QUE HAGAN, LA REALIDAD ES QUE ESTARÁN ESENCIALMENTE EN IGUAL SITUACIÓN QUE LOS MAESTROS QUE ASPIRAN A PUESTOS EN LAS ALCALDÍAS Y EN LA LEGISLATURA.* ¿Es que estos maestros candidatos no *contaminarán* a los estudiantes? Como tales, continuarán enseñando y, al decir mayoritario, *supuestamente* elaborando sus planes durante las noches y los días libres. ¿CÓMO PUEDEN IGNORAR Y VALIDAR ESTA NOTABLE DISCRIMINACIÓN *ENTRE LOS MISMOS MAESTROS*? La razón económica aducida —de "alto costo"— va a la médula discriminatoria. Mientras que a unos maestros se les reconoce el subsidio y se les paga el sueldo, a *otros* —en situaciones *idénticas*— *se les niega*. EL RESULTADO ES UNA CLASIFICACIÓN DISCRIMINATORIA, DE SU FAZ INCONSTITUCIONAL, FUNDAMENTADA ÚNICAMENTE EN UNAS CATEGORÍAS JERÁRQUICAS DE CARGOS ELECTORALES.

Aparte de este análisis, el nuevo estatuto *crea otras categorías impermisibles*. Según expuesto, los "maestros del salón de clase", una vez nominados oficialmente, quedan de manera automática relevados a partir del 1ro de agosto *con derecho a la licencia especial*. A los Superintendentes de escuelas, los directores y el personal docente que estén ocupando puestos de *supervisión* —y claro está, de supuesta influencia sobre estudiantes y padres— también se les prohíbe la participación activa en la política. De igual forma quedan *automáticamente relevados* cuando *anuncien o realicen gestiones en favor de sus candidaturas* o sean *oficialmente* nominados. Ahora bien, la ley los trata de un modo diferente: será "*sin* paga *desde* la *fecha en que ocurra cualesquiera de los eventos antes mencionados* hasta el lunes inmediatamente siguiente a la fecha en que se celebren las elecciones generales". (Énfasis suplido.) 3 L.P.R.A. sec. 393m. *Sólo* si

resultan *oficialmente* nominados "tendrá[n] derecho, si así lo solicita[n], a que se le[s] conceda una licencia especial con paga . . .". Íd.

Advertimos, pues, *que al igual que a los maestros en clase, al personal en funciones de supervisión se le impone idéntica prohibición de participar y hacer política partidista.* Si deciden hacerlo, quedan también *relevados pero sin sueldo. Sólo si logran una nominación oficial serán acreedores al mismo.* En otras palabras, si no tienen éxito en oficializar la nominación, no cobran aun cuando quedaron "relevados" por ministerio de ley. La mayoría trata de soslayar esta realidad —trato inconstitucionalmente discriminatorio— relegándola al esc. 4 y diciéndonos que "[p]or no estar ante nuestra consideración, en buena metodología adjudicativa y constitucional, *no procede que evaluemos la validez de estas modificaciones* . . .". (Énfasis suplido.) Opinión mayoritaria, pág. 871. Nos preocupa este *razonamiento* y su *consistencia doctrinal*; la cuestión es *medular.*

¿En qué quedamos? En la estructura interna de la decisión mayoritaria, ¿cómo armonizar esta abstención adjudicativa con la conclusión de que "al adjudicar la controversia se toma en consideración que la ley se aplicará *no como estaba antes*, sino como está *luego* de enmendada"? (Énfasis suplido.) Opinión mayoritaria, pág. 866. ¿Cómo compaginarla con que "[l]a aprobación de la Ley Núm. 68, *supra, no pone fin* a la controversia que dio fundamento al pleito original"? (Énfasis suplido.) Íd., pág. 871. Según ellos, ¿no gira precisamente la controversia ante nos "*exclusivamente* sobre la validez de la concesión legislativa de esta licencia *para favorecer a un grupo de empleados públicos*" frente a otros"? (Énfasis suplido.) Íd. ¿Es que los maestros de los salones de clase que aspiren mañana al *cargo electivo de asambleísta municipal* y el personal de *supervisión* que desee postularse *no constituyen también* "un grupo de empleados públicos"?

Aun bajo la falacia mayoritaria de que son *distintas* categorías, ¿no reconocieron antes la probabilidad de que *otros* empleados públicos "aspir[en] a puestos electivos y soliciten licencias con

sueldo"? Opinión mayoritaria, pág. 866. ¿Por qué posponer que se enjuicie la validez de estas modificaciones? ¿Para cuándo? ¿No aceptaron también el "poco tiempo que transcurre entre la certificación de una candidatura y el día de las elecciones . . ."? Íd. ¿Qué de la "alta probabilidad de que el asunto no pueda resolverse finalmente antes de que se celebren los comicios . . ."? Íd. ¿Cómo la mayoría cuadra su decisión con la conclusión de que la cláusula constitucional sobre igual protección "se activa cuando nos *enfrentamos* a una legislación o a una acción estadual que *crea clasificaciones entre grupos, discriminando a unos frente a otros*"? (Énfasis suplido.) Íd., pág. 872.

La verdad es que esta posposición no es otra cosa que un subterfugio mayoritario para evitar que se decrete la inconstitucionalidad del *viejo* y *nuevo* diseño estatutario que *claramente discrimina* no sólo contra todos los empleados públicos, *sino frente al grueso de los maestros que tradicionalmente se ha beneficiado de estas licencias políticas*. Al igual que la Asamblea Legislativa, la mayoría del Tribunal los deja, más que en una "incertidumbre", en un *limbo irredimible*.

Finalmente, en cuanto a este extremo, la abstención de la mayoría contrasta lastimosamente con la actuación reciente en *Nogueras v. Hernández Colón*, 127 D.P.R. 638 (1991). Allí, al mutilar *ex parte* los derechos de los jueces de instancia —partes indispensables— a permanecer en sus respectivos cargos hasta que sus sucesores fueran nombrados y tomaran posesión de sus cargos —bajo la cláusula de continuidad (*holding over clause*) vigente en la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico— no tuvieron ninguna reserva para *"sua sponte"* *configurar una controversia distinta* que *no* había sido planteada ni discutida por *nadie*, y que no estaba justificada por los hechos.

*ESTA LEGISLACIÓN NO EVITA EL PROSELITISMO POLÍTICO EN LAS AULAS. APARTE DEL ABSURDO EXPUESTO* SOBRE LOS MAESTROS CANDIDATOS A ASAMBLEÍSTAS —QUE *CONTINÚAN ACTIVAMENTE DENTRO DE LOS SALONES*— VERDADERAMENTE ES TAN DEFECTUOSA Y CARENTE DE LÓGICA *QUE, IN-*

*CLUSO, PASA POR ALTO* LA DINÁMICA PROSELITISTA Y LAS NOMINACIONES QUE GENERAN TANTO LAS *PRIMARIAS INTERNAS* DE LOS PARTIDOS POLÍTICOS COMO LAS *PRIMARIAS PRESIDENCIALES. EN ESTOS EVENTOS EXISTEN LOS MISMOS RIESGOS* QUE INTENTA SUPERAR LA LICENCIA CON SUELDO EN LA ETAPA POSTERIOR DE LA NOMINACIÓN *OFICIAL* PARA LAS ELECCIONES GENERALES.

Y es que, innegablemente, desde los meses febrero y marzo del año eleccionario, *todos* o un *número sustancial de estos maestros aspirantes estarán enfrascados* en plena actividad primarista. Por definición, una primaria es un asunto *eminentemente político* en el cual "los electores de los partidos nominan sus candidatos a cargos públicos electivos". Art. 1.003(47) de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3003(47). Es un evento que involucra, en mayor o en menor grado, un segmento poblacional. Como tal, genera una campaña publicitaria, directa e indirecta, remunerada o gratuita, y amplia o limitada. "El atractivo de los nombres y símbolos adoptados, las posiciones de los candidatos y los intercambios de ideas, encuentran cabida, expresión y eco en la prensa radial, escrita y televisada del país. La audiencia electoral aumenta. Las primarias, en su fase preparatoria y eleccionaria, *producen entusiasmo entre los seguidores de los distintos candidatos y partidos políticos.* Constituyen un medio efectivo de *propaganda* para mantener activa la agrupación política, y vivas las controversias de importancia. En ese sentido los estudiosos reconocen que toda primaria representa un vehículo positivo de proselitismo político para partidos y candidatos ganar adeptos a sus causas." (Énfasis suplido.) *P.I.P. v. E.L.A.,* 109 D.P.R. 403, 418–419 (1980), opinión disidente.

EN RESUMEN, LA ESTRUCTURA DE LA CLASIFICACIÓN LEGISLATIVA DERROTA SUS PROPÓSITOS. EL MAL QUE INTENTA REMEDIAR SUBSISTE POR RAZÓN DE LA EXCLUSIÓN DE LOS MAESTROS CANDIDATOS A ASAMBLEÍSTAS MUNICIPALES. EL EFECTO DE LOS PROCESOS PRIMARISTAS INTERNOS Y PRESIDENCIA-

LES, PREVIOS AL MES DE AGOSTO, ANULA TODO ES-
FUERZO DESPOLITIZADOR.

IV

*Doble vara adjudicativa injusta*

Aclarados estos aspectos, examinemos críticamente las otras
conclusiones de la opinión mayoritaria suscrita por el Juez
Asociado Señor Hernández Denton. En principio, reconocemos
que la oportunidad de ser candidato no es un derecho de carácter
fundamental. *García v. Luciano*, 115 D.P.R. 628 (1984). Sin
embargo, otra vez la óptica mayoritaria se nubla: *los hechos de
este caso no configuran una controversia en cuanto al derecho a
ser candidato, ya que la misma se orienta al carácter fundamen-
tal de la participación equitativa de candidatos en procesos
eleccionarios.*

En este sentido es incomprensible y paradójico que, de un
lado, pueda sostener "que el derecho a ser candidato a un cargo
electivo *no es un derecho fundamental*" —(énfasis suplido) opi-
nión mayoritaria, pág. 875— y, del otro, proceda a justificar la
legalidad de este subsidio electoral a los maestros precisamente a
base de ese *mismo objetivo.* ¿Es que el "'derecho a la libre
expresión del *magisterio*'" —(énfasis suplido), íd., pág. 870—
proclamado en el propio Informe de la Comisión Especial Con-
junta, *supra*, deja de ser fundamental para quienes no son
maestros? ¿Qué lógica explica ese doble trato? Tampoco entende-
mos el aserto mayoritario de que la clasificación estatutaria "no
*menoscaba* ni prohíbe a los empleados públicos la *capacidad* ni la
oportunidad de ser candidatos a puestos electivos", (énfasis
suplido) opinión mayoritaria, pág. 875. SI BIEN NO LO
PROHÍBE TOTALMENTE, NO ES MENESTER MUCHA
IMAGINACIÓN PARA COMPRENDER *QUE HACE MÁS
ONEROSA LA POSTULACIÓN PARA AQUELLOS FUNCIO-
NARIOS Y EMPLEADOS PÚBLICOS* —COMO LOS AQUÍ
DEMANDANTES APELADOS BERBERENA *ET AL.*— QUE
NO TUVIERON NI TIENEN EL BENEFICIO DE IGUAL

LICENCIA CON SUELDO. Éstos, al negárseles *todo tipo de licencia* para lograr sus legítimas aspiraciones, se vieron en la disyuntiva de renunciar a sus trabajos u optar, *como lo hicieron, a hacer campaña después de sus horarios de trabajo regulares.* Sinceramente, ¿no representa esto un "menoscabo" *significativo en tiempo y en oportunidad?* ¿Qué de la desigualdad económica creada? Por ser altamente especulativo, de poco valor persuasivo resulta decir que la clasificación no les afectó la "oportunidad de ser candidatos", pues "dos (2) de ellos fueron electos . . .". Íd. ¿Qué pasó con los otros *no* electos?

EN ESTAS CIRCUNSTANCIAS, REHUSAMOS RUBRICAR UNA TÉCNICA JUDICIAL QUE USA *DOS (2) VARAS DISTINTAS* PARA MEDIR SITUACIONES SIMILARES O PARECIDAS EN DETRIMENTO DEL MANDATO CONSTITUCIONAL SOBRE "IGUAL PROTECCIÓN DE LAS LEYES". Art. II, Sec. 7 de la Carta de Derechos, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 275.

*Sin exponer razones válidas*, la mayoría *abandona* la norma adoptada en *Pacheco v. Srio. Instrucción Pública*, 108 D.P.R. 592, 597 (1979), en que reconocimos la naturaleza clara de *subsidio electoral* con fondos públicos de esta licencia, que "crea un privilegio para una clase en particular que debe a su vez ser examinado y aplicado a base de un *estricto* escrutinio judicial". (Énfasis suplido.) NO SÓLO DESCARTAN ESA JURISPRUDENCIA, SINO QUE LE NIEGAN FILIACIÓN CONSTITUCIONAL AL PRINCIPIO IGUALITARIO QUE RIGE LOS DESEMBOLSOS PÚBLICOS PARA FINES POLÍTICO-PARTIDISTAS. *DE UN PLUMAZO HAN SUPLANTADO EL ESCRUTINIO ESTRICTO DE REVISIÓN JUDICIAL POR EL TRADICIONAL MÍNIMO.*

## V

*Irracionalidad de licencia*

En los *méritos*, más allá de la insostenible hipótesis *elitista* y de *privilegio*, ¿adelanta *racionalmente* un interés legítimo guber-

namental? La mayoría intenta justificar este odioso discrimen argumentando que "[t]anto la anterior legislación como el órdenamiento aprobado recientemente *requieren* de forma expresa que un *maestro sea relevado de sus funciones al aceptar una candidatura para uno de los cargos descritos. Los empleados públicos que originan esta controversia no tienen una restricción similar y pueden aceptar una candidatura y continuar trabajando en sus funciones regulares siempre que no utilicen su posición oficial para fines político-partidistas en violación a la Ley de Personal del Servicio Público de Puerto Rico, 3 L.P.R.A. sec. 1371(2)".* (Énfasis suplido y en el original.) Opinión mayoritaria, págs. 875–876. Concentrémonos en este *crucial argumento.*

Es obvio que el derecho de los maestros de las escuelas públicas "a participar en cualquier momento u ocasión en campañas y actividades políticas, a ser candidatos para cargos públicos electivos o de nombramiento, y a defender sus propias candidaturas o la candidatura de cualquier otra persona" —Sec. 4 de la Ley Núm. 25, *supra*, 18 L.P.R.A. sec. 249b— *no es absoluto ni irrestricto.* NATURALMENTE, LES ESTA VEDADO, SO PENA DE SANCIONES DISCIPLINARIAS, EJERCER ESOS DERECHOS EN LAS AULAS, ESTO ES, *HACER POLÍTICA DURANTE SU HORARIO DE LABORES* Y *"DENTRO DEL SALÓN DE CLASES* Y CUALESQUIERA ESTRUCTURAS O TERRENOS BAJO LA JURISDICCIÓN DE LAS AUTORIDADES . . .".* (Énfasis suplido.) Sec. 5 de la Ley Núm. 25, *supra*, 18 L.P.R.A. sec. 249c.

A poco reflexionemos, ¿no es esta prohibición precisamente *igual* a la de los *demás* empleados públicos? A estos últimos, ¿no se les prohíbe *también* utilizar su posición oficial para fines político-partidistas? *A todos les está vedado hacer política en sus horas laborables en sus oficinas y en los lugares en que se desempeñan.* No puede perderse de vista que los demandantes apelados Berberena *et al.*, al igual que los demás empleados del Gobierno, *están sujetos también a una misma prohibición* conforme la Sec. 6 de la Ley de Personal del Servicio Público de Puerto Rico, Ley Núm. 5 de 14 de octubre de 1975 (3 L.P.R.A. sec.

1371). Ésta, en lo pertinente, les impide "[u]tilizar su posición oficial para fines político partidistas o para otros fines no compatibles con el servicio público". 3 L.P.R.A. sec. 1371(2).

Vemos, pues, que el *punto de partida común* —tanto para maestros como para *otros* empleados públicos— es que *no pueden hacer política en sus respectivos sitios de trabajo.* La *prohibición es similar.* La diferencia que esgrime la mayoría —el relevo automático del cargo— es *efecto y no causa de esa prohibición común a todos* los empleados públicos, *no sólo* a los *maestros.* Y esta prohibición, *igual para todos*, es el factor verdaderamente importante que ha servido tradicionalmente de excusa o de razón para el legislador *haber impuesto a los maestros la obligación de automáticamente cesar de trabajar al oficializarse sus candidaturas.* Esta visión ha sido así expuesta:

> Las actividades de un maestro que razonablemente tengan pertinencia con su habilidad, eficiencia e influencia en el salón de clases, es para nosotros un aspecto legítimo a ser reglamentado.
>
> Concedemos que un maestro tiene el mismo privilegio que cualquier cuidadano, a aspirar a ser un candidato a un cargo electivo público. Esa candidatura no debería ser, y no es, base para cancelar su contrato como maestro permanente. *Pero cualquiera que haya sido candidato reconoce que la actividad política tiende a interferir con su vocación usual, y este hecho,* independientemente de cualquier posible envolvimiento del sistema educativo en la controversia política, es una razón sólida para temporeramente separar al candidato de la escuela. En términos generales, esta regla *aplicada a todos los maestros no nos parece irrazonable* . . . . (Traducción y énfasis nuestros.) *School City of East Chicago v. Sigler*, 36 N.E.2d 760, 762 (1941). Véase Anotación, *School Employee-Political Activity*, 13 A.L.R. 1154.

Según este enfoque tradicional, *la supuesta incompatibilidad de ser simultáneamente maestro y candidato*, es la que sostiene el relevo automático y, por ende, la legitimidad y la necesidad de continuar pagándoles el sueldo.

Si la prohibición de hacer política *dentro de las aulas* es una restricción válida y razonable —*así lo creemos y nadie nunca la ha cuestionado*— ¿qué razón de ser, necesidad o racionalidad

tiene el *relevo automático* que sirve de ancla al subsidio electoral mediante la licencia *con* sueldo? ¿Qué impide que los maestros, una vez sean candidatos, continúen enseñando *sin hacer política*? Si, como alega la mayoría, el problema es de *conveniencia* —no tienen tiempo suficiente para hacer ambas cosas— ¿qué evita que se acojan a las licencias *regulares* que tengan acumuladas, incluso *sin sueldo*, después de agotar las primeras para dedicarse de lleno a la política? ¿Por qué razón *forzarlos* a que cesen de enseñar?

*No hay nada en el récord que sostenga la veracidad de la tesis de que el cargo de maestro es incompatible con una candidatura.* La imposición de una licencia *mandatoria* a los maestros por el *sólo hecho de ser candidatos a cargos electivos,* "sin una sola alegación ni demostración de que sus actividades políticas podrían afectar sus trabajos como maestros [es *inconstitucional.*] No existe evidencia de que el aspirar a un cargo político sea una actividad que impida a los maestros descargar sus responsabilidades". (Traducción nuestra.) *Allen v. Board of Ed. of Jefferson County,* 584 S.W.2d 408, 410 (1979). Si fáctica y jurídicamente es así, *entonces el relevo es ARTIFICIAL, carece de toda racionalidad, es improcedente y el subsidio es innecesario.*

CHOCA, PUES, QUE FRENTE A PROHIBICIONES ESENCIALMENTE *SIMILARES* SE ERIJA UN ESTATUTO DE *PRIVILEGIOS* QUE PERMITE SÓLO A *ALGUNOS* MAESTROS "UTILIZAR SU POSICIÓN OFICIAL PARA FINES POLÍTICO PARTIDISTAS" Y DEVENGAR ASÍ UN SUELDO. 3 L.P.R.A. sec. 1371(2). A FIN DE CUENTAS, ¿NO ESCOGIERON *TODOS* LIBREMENTE ENTRAR EN LA ARENA POLÍTICO-PARTIDISTA Y NOMINARSE PARA UN CARGO ELECTIVO?

## VI

*Privilegio económico inconstitucional*

La *fragilidad* constitucional de este privilegio económico se manifiesta, *además,* en *dos (2) dimensiones*: las prohibiciones dimanantes del *espíritu* que informa el Art. VI, Secs. 9 y 10 de

nuestra Constitución, *supra*, págs. 369 y 373, en el sentido de que "[s]ólo se dispondrá de . . . [los] fondos públicos para fines públicos", y que "[n]inguna ley concederá compensación . . . a un funcionario [o] empleado [gubernamental] . . . después que los servicios hayan sido prestados . . .". *AMBAS SECCIONES ESTÁN A TONO CON EL PRINCIPIO ELEMENTAL DE SANA ADMINISTRACIÓN Y MORALIDAD PÚBLICA DE PROSCRIBIR EL PAGO DE SUELDOS POR SERVICIOS NO PRESTADOS.* Este subsidio no sólo es INCONSTITUCIONAL, sino —¿por qué no decirlo?— *INMORAL.*

COINCIDIMOS CON EL ILUSTRADO FORO DE INSTANCIA EN QUE EL DECRETO DE INCONSTITUCIONALIDAD ERA UN IMPERATIVO DECISORIO INSALVABLE. No podía dicho foro —como tampoco nosotros— superarlo, extendiendo a los demás empleados y funcionarios públicos igual licencia con sueldo. DE SU FAZ, ESE REMEDIO SERÍA INCONSTITUCIONAL, PUES HUBIESE CREADO UN PRIVILEGIO *MAYOR*, ESTA VEZ EN *BENEFICIO DE TODO EL PERSONAL DEL GOBIERNO, EN DETRIMENTO DEL CIUDADANO PRIVADO. SE AHONDARÍA MÁS LA CLASIFICACIÓN DISCRIMINATORIA.*

## VII

*Abdicación de la mayoría de la función constitucional del tribunal*

CAUSA MAYOR CONSTERNACIÓN EL *NUEVO* ENFOQUE MAYORITARIO DE REVISIÓN JUDICIAL FUNDAMENTADO EN ARGUMENTOS DE RAZONAMIENTO CIRCULAR. Nos dicen que debemos *abstenernos de enjuiciar la constitucionalidad* de esta legislación, pues estamos ante un "área que compete a las otras ramas del Estado . . .". Opinión mayoritaria, pág. 876. *¿QUÉ LEGISLACIÓN NO LO ES?* Además, consignan que "nuestra facultad de interpretar la Constitución del Estado Libre Asociado y las leyes del país *no* debe extenderse a evaluar la sabiduría o los beneficios públicos de esta legislación". (Énfasis suplido.) Íd.

*ES LAMENTABLE QUE LA MAYORÍA PONGA LA ETI-
QUETA DE SABIDURÍA PARA LAVARSE LAS MANOS.* NO
JUZGAMOS SU "SABIDURÍA", SINO SU "VENTAJERÍA"
ELECTORAL, Y ELLO BAJO LA CLÁUSULA CONSTITU-
CIONAL SOBRE IGUAL PROTECCIÓN DE LAS LEYES. *Y
OLVIDAN TAMBIÉN QUE PRECISAMENTE AQUÍ ESTÁ
EN JUEGO LA CONSTITUCIONALIDAD DE ESTOS "BE-
NEFICIOS" AL MAGISTERIO, PUES SON FONDOS PÚBLI-
COS QUE PERTENECEN AL PUEBLO, NO A LOS LEGIS-
LADORES.*

Este *peculiar* enfoque mayoritario de revisión judicial, *de
reciente cuño*, va más lejos: "Tampoco debemos ceder a la
*tentación* de revisar los criterios utilizados por las otras ramas del
Gobierno al formular la política pública y al establecer *las
prioridades fiscales*." (Énfasis suplido.) Opinión mayoritaria, pág.
876. *Estamos perplejos.* CREÍAMOS QUE LA REVISIÓN JU-
DICIAL CLÁSICA EN TORNO A PLANTEAMIENTOS
CONSTITUCIONALES CONSISTÍA EN EVALUAR LOS
CRITERIOS UTILIZADOS POR LA LEGISLATURA Y, A LA
LUZ DE LOS MISMOS, DICTAMINAR LA EXISTENCIA O
NO DE NEXOS RACIONALES.

Culmina con la sentencia de que es "tarea legislativa [el]
establecer las prioridades presupuestarias y [judicialmente no
debemos] *intervenir en asuntos relacionados con el uso de fondos
públicos . . .*". (Énfasis suplido.) Opinión mayoritaria, pág. 876. Al
igual que un eminente constitucionalista, nos preguntamos: "¿Sig-
nifican estas expresiones que el Tribunal Supremo ha ingresado
en las filas de los 'no interpretacionistas' ('non interpretivits')?" R.
Serrano Geyls, *Derecho Constitucional de Estados Unidos y
Puerto Rico*, San Juan, Ed. C. Abo. P.R., Sup. 1989, pág. 1.

Después de leer estos pronunciamientos *restrictivos* en *torno
al ámbito de nuestra intervención adjudicativa*, estamos conven-
cidos de que se deben a que el Tribunal ha aplicado al caso de
autos, *sub silentio*, la doctrina de abstención judicial bajo la
creencia de que estamos ante una "cuestión política". *NO TENE-
MOS OTRA FORMA DE EXPLICAR ESTA EXTRAÑA ABDI-*

*CACIÓN DECISORIA.* HAN EQUIPARADO "CUESTIÓN PO- LÍTICA" CON "USO DE FONDOS". Con todo respeto, *otra vez recomendamos* cerrar oficialmente las puertas de la Secretaría de este Tribunal y dedicarnos, desde nuestras oficinas, *a ser espec- tadores pasivos* de los quehaceres legislativos y ejecutivos *en materia de desembolsos públicos. Nogueras v. Hernández Colón,* supra, opinión disidente.

Incurren en un grave error al tratar de justificar esta legislación a base del hecho de que la "[gran mayoría de las veces] los maestros utili[zan] . . . su tiempo libre para atender estas responsabilidades inherentes al magisterio". Opinión mayoritaria, pág. 879. Esta conclusión es UNA GRAN *FALACIA.* La apunta- lan en el extenso diálogo sostenido en 1960 entre la entonces Presidenta de la Asociación de Maestros, Sra. María Arroyo de Colón, y varios senadores de la Comisión de Instrucción del Senado de Puerto Rico. Opinión mayoritaria, págs. 879–881. Distinto a como concluyen, pasan por alto que al ella comunicar su experiencia *no lo hizo con referencia a otros ("demás") funcio- narios públicos.* Claramente contestó que "*no habl[ó] con otros empleados del Gobierno*'", sino con "'algunos agricultores y . . . algunos comerciantes'", entre ellos su "'marido'", y que en esa reunión de comerciantes "'ellos no compararon con los demás empleados del [G]obierno'". (Énfasis suplido.) Íd., pág. 879.

Sostener en *esa limitada experiencia* la racionalidad de esta legislación es pecar de ingenuos. ¿Cómo pueden dar como hecho probado *que todos los días* "'el maestro da sus clases hasta las 4:00 de la tarde. Desde las 7:00 que se va de su casa [o] las 71/2, y entonces después que va y *se baña*[,] y *come y atiende a su familia,* entonces tiene que *sentarse* a escribir los planes, prepa- ración de la lección del otro día. *No puede irse a la noche* y seguir siendo maestro, por eso, porque tiene que irse'". (Énfasis en el texto original suprimido y énfasis suplido.) Opinión mayoritaria, pág. 880.

Para terminar, en este extremo es un tanto *irónico* que la mayoría cite el caso *De Paz Lisk v. Aponte Roque,* 124 D.P.R. 472 (1989). Opinión mayoritaria, pág. 881. La ciudadanía americana es

un requisito insuperable para postularse y ocupar cualquier cargo público electivo. Si allí resolvieron que el criterio de ciudadanía de Estados Unidos no es condición indispensable a la *idoneidad* profesional (*De Paz Lisk v. Aponte Roque,* supra, págs. 491–492), ¿cómo ahora validar "el interés de estimular a los maestros a aportar su experiencia y su talento *en el proceso electoral* y en la administración de los gobiernos estatales y municipales"? (Énfasis suplido.) Opinión mayoritaria, pág. 881.

## VIII

### Desigualdad intolerable

Por lo demás, basta reproducir los fundamentos expuestos en nuestro disenso de 21 de diciembre de 1988:

> *De este historial [de la ley] se desprende que con la sola autorización y licencia sin sueldo al maestro se lograban los objetivos originales.* Sin embargo, a título de privilegio, fueron ampliados para darle el sueldo con miras a "la seguridad económica tan necesaria para la tranquilidad suya y la de su familia". Además, el Procurador General nos aduce que con ello se establece un mecanismo de economía fiscal; de conveniencia administrativa para el Departamento de Instrucción Pública, se ayuda al maestro a recuperar "sus fuerzas tanto físicas como emocionales e intelectuales", y se les retiene en el servicio público de forma tal que, al éstos reintegrarse a las escuelas, benefician y enriquecen a sus alumnos con la experiencia adquirida en la contienda electoral o desempeño del cargo electivo.
>
> No son persuasivos estos argumentos. El privilegio es innecesario y lastima "el postulado de igualdad inmerso en nuestra Constitución. Históricamente ese ideal ha cobrado vida en el esquema integral financiero trazado por la Asamblea Legislativa para lograr paridad económica entre los partidos políticos y los candidatos". *Marrero v. Mun. de Morovis,* 115 D.P.R. 643, 646 (1984). A fin de cuentas, "la levadura que hace crecer nuestro sistema democrático es el libre intercambio y el choque pacífico de ideas. La igual oportunidad económica para diseminarlas es requisito indispensable y consustancial a ese postulado". *P.S.P. v. Srio. de Hacienda,* 110 D.P.R. 313, 327 (1980).
>
> Esta desigualdad oficial se patentiza con mayor dramatismo y crudeza en múltiples instancias. *Primero,* respecto al empleado

público que no pertenece al magisterio y que se enfrenta como adversario político a un maestro que disfruta del privilegio de esta licencia con sueldo. La circunstancia es claramente arbitraria. Se da en este caso la situación anómala de que el Estado *subsidia* salarialmente a un empleado público —el maestro incumbente— *durante la campaña electoral,* en franco perjuicio de *otro empleado* que no puede acogerse a beneficio económico alguno. *¿Puede alguien sinceramente sostener y justificar esta desigualdad? ¿Es que sólo los maestros son acreedores a la "seguridad y tranquilidad" económica personal y familiar? Los otros empleados y funcionarios públicos, ¿no agotan también sus fuerzas físicas, emocionales e intelectuales en la campaña electoral? ¿Quiénes van a desgastarse más: los maestros sin tener que trabajar o los candidatos que no gozan de este privilegio y subsidio salarial electoral, y que tienen que —al decir del Procurador General— "trabajar en su campaña política fuera de las horas laborables y continuar desempeñándose como servidor[es] público[s]"? ¿Cabe argumentar economía fiscal para el Departamento de Instrucción Pública —luego de la licencia con sueldo por varios meses— en virtud de igual licencia subsiguientemente pasadas las elecciones generales "hasta la terminación del primer semestre escolar",* 18 L.P.R.A. sec. 249d? *¿Qué de los salarios que devengarán los maestros que sustituyan a los maestros candidatos? ¿No se está realmente duplicando parte de la nómina del Departamento de Instrucción Pública? ¿No atenta ello al recto y prudente sentido común de igualdad que debe animar a todos?* Marrero v. Mun. de Morovis, supra. *¿Puede seriamente argumentarse que este esquema adelanta propósitos de conveniencia administrativa y economía fiscal?* La *segunda* situación resulta aún más *dramática.* Si bien es cierto que la mayoría de los empleados públicos *teóricamente* tienen el derecho a una licencia *sin* sueldo para defender su candidatura política, no es menos incontestable que su concesión es *discrecional.* Ese tratamiento conlleva un riesgo evidente. El alto grado de politización que experimenta nuestro país maximiza las posibilidades de ese candidato —que no pertenece al partido en el poder o, cuando menos, no es afecto al poder nominador en cuyas manos reside la autoridad decisoria— se vea negativamente afectado. El revanchismo político —característico de los cambios de poder en nuestro sistema gubernativo— sin duda se convierte en una amenaza efectiva contra el potencial disfrute de lo que en otras circunstancias debiera constituir un auténtico derecho. *El caso de autos es un buen ejemplo. Aquí, los empleados a quienes*

*sistemáticamente les negaron las licencias —aún sin sueldo—* *pertenecían al P.N.P., principal opositor del Partido Popular Democrático (P.P.D.). Tercero,* al ponerse en vigor esta licencia *con* ·sueldo para los maestros, *la Legislatura subsidia, además, a un empleado público frente a aquellos ciudadanos, también aspirantes, que no prestan servicios gubernamentales ni públicos.* De este modo se logra ampliar sustancialmente los límites establecidos en el fondo electoral. Y, claro está, dependiendo del número de maestros coincidentes en una misma afiliación partidista, se altera peligrosa e irremediablemente la paridad económica visualizada en la ley. "La idea de equilibrio, de equiparación situacional o, si se prefiere, de equivalencia de posibilidades de acción humana constituye una base indesplazable para la configuración de la noción de Justicia." J.C. Smith, *Fundamentos de la relatividad de la justicia,* 1983-B Rev. Jur. Arg. La Ley 1010 (1983).

Ante esta realidad, ¿cuánto tiempo más habrá que esperar para que alguna generación del Poder Judicial reivindique la norma de igualdad constitucional?

". . . [E]sta disposición de ley, en lugar de aislar la política partidista de las escuelas, la fomenta y promueve, desvirtuando el propósito legislativo de 'mantener un ambiente docente libre de banderías, prejuicios y pasiones de toda clase.' El estímulo y mensaje son claros, a saber: 'maestro entra en política, que mientras se decide si eres o no electo, continuarás devengando tu sueldo sin que rindas servicio pedagógico alguno.' Ello es así pues para un maestro beneficiarse de la licencia con paga tiene que ser certificado como candidato de manera oficial. Esto implica que previamente habrá realizado activamente una campaña como aspirante de un partido político o como candidato independiente en el proceso primarista o de pre-candidatura, cuando todavía labora como maestro. .

Esta ley ilustra c[ó]mo en una sociedad erigida sobre bases democráticas, el péndulo puede oscilar a extremos irrazonables y peligrosos, a saber, desde una prohibición estatutaria al magisterio de participar activamente en la política (Sec. 52 de la Ley Escolar Compilada aprobada en 12 de marzo de 1903) hasta la eliminación de este interdicto legislativo con el exceso de una licencia especial con sueldo sin rendir servicio alguno." (Escolio omitido.) *Pacheco v. Srio. Instrucción Pública, supra,* pág. 603. (Énfasis suplido y en el original.) *Berberena v. Echegoyen,* 123 D.P.R. 76, 97–100 (1988).

## IX

### ⌐ Conclusiones

Somos conscientes de que este subsidio electoral *sólo benefi-cia* directamente a los *maestros políticos* de instrucción pública y, claro está, a los *partidos*. Aun ante la grave crisis presupuestaria por la cual atraviesa el país, es comprensible, pues, la renuencia de la Asamblea Legislativa y del Primer Ejecutivo a eliminarlo.

No entendemos, sin embargo, la decisión mayoritaria. Hemos visto su inconstitucionalidad; ni aun bajo el escrutinio de mínima racionalidad puede validarse. *Nuestro papel y responsabilidad judicial es otro.* "[L]a Constitución provee un esquema de pesos y contrapesos para regir procesos duraderos, más allá de un cuatrienio en particular. No debe, pues, confundirse la armonía pasajera y el consenso coyuntural propio de un momento en que *un solo partido político controla ambas ramas.* Por esa razón la presente decisión, al igual que cualesquiera otras, tiene que superar esa visión inmediata y debe ser capaz de proyectarse hacia el futuro con mayor perspectiva. . . . Más allá de la disertación abstracta de teoría constitucional que discurre en la opinión mayoritaria, ese frente común nos pone nuevamente en el umbral del dilema perenne: ¿DEMOCRACIA O PARTI-DOCRACIA?" (Énfasis en el original.) *Nogueras v. Hernández Colón*, 127 D.P.R. 405, 429–430 (1990), opinión disidente.

"*A los auspicios de los privilegios de la clase magisterial de mayor ascendencia e influencia en el panorama político del país, se suma hoy el Tribunal Supremo.* El recíproco 'usufructo histórico que ata esta ley a los partidos políticos y maestros . . . cobijados bajo la misma' —*Pacheco v. Srio. Instrucción Pública,* supra, pág. 601— aparentemente . . . han elevado [el subsidio] de categoría *legal* a una *sacramental.*" (Énfasis en el original.) *Berberena v. Echegoyen,* supra, págs. 100–101.

¿Cómo puede la mayoría rubricar la visión legislativa de 1960 y hoy justificar la licencia de un sueldo político en el alegado "derecho . . . sagrado del estudiante a recibir la enseñanza sin adulteraciones procedentes de la parcialidad política del maestro"

—Informe de la Comisión de Instrucción de la Cámara. de Representantes sobre el P. de la C. 718, 19 de febrero de 1960; pág. 2— si *treinta (30) años después se admite su fracaso debido a la* *"manipulación político partidista* en. el Sistema de Instrucción Pública *que trastoca el compromiso de los educadores con su principal tarea que es la de educar"*? (Énfasis suplido.) Informe de la Comisión de Educación, *supra*, pág. 5. ¡NO NOS ENGA-ÑEMOS MÁS! Mientras se promueva y subsidie *con sueldos* la participación del magisterio en la política, *será imposible despolitizar el Sistema de Educación Pública.*

La mayoría del Tribunal ha extraviado la ruta constitucional decisoria. "La formulación del derecho constitucional inevitablemente implica un ejercicio considerable de discreción. La Constitución simplemente suministra un mapa de los destinos necesarios y para llegar, un bosquejo, algo incompleto, de las carreteras. La lectura de ese mapa requiere consultar una variedad de autoridades, ninguna de las cuales, aisladamente puede dictar la mejor carretera a seguir. Al final, el valor de cualquier autoridad constitucional se mide por la capacidad que tiene el tribunal de no extraviarse. Usando este criterio, las determinaciones fácticas sirven de brújula importante para señalar las rutas constitucionales." (Traducción nuestra.) Faigman, *supra*, pág. 613.

DEFINITIVAMENTE, EN MATERIA DE *INTERPRETA-CIÓN JURÍDICO-CONSTITUCIONAL SOBRE DESEMBOL-SOS PÚBLICOS Y DERECHO ELECTORAL,* PUERTO RICO ESTÁ PASANDO POR UN PERÍODO DE *RETROCESO MUY PELIGROSO. LA BRÚJULA QUE USA LA MAYORÍA, EN MANOS DEL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON, ESTÁ DESIMANTADA. OTRA VEZ HA PREVA-LECIDO LA PARTIDOCRACIA.*

—O—

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

La controversia constitucional planteada por este recurso se presenta con gran claridad. Conforme las disposiciones de la Ley

Núm. 25 de 3 de junio de 1960 (18 L.P.R.A. ants. secs. 249–249e), según la misma ha sido enmendada, todo maestro de instrucción pública oficialmente nominado por un partido político(1) para un cargo público de elección popular que acepta y decide defender su candidatura, tiene derecho a disfrutar de una *licencia especial con paga* desde el primero de agosto del año eleccionario hasta un día después de celebrados los comicios generales. Durante este período el Estado "releva automáticamente" al maestro del desempeño de su tarea magisterial *y le garantiza un sueldo para que defienda a tiempo completo sus aspiraciones políticas*. Véase Sec. 6 de la citada Ley Núm. 25 (18 L.P.R.A. ant. sec. 249d). *A ningún otro servidor público se le concede estos derechos y beneficios.*

El fundamento detrás de tan *extraño y peculiar mandato legislativo*, conforme surge del historial legislativo de la citada Ley Núm. 25, lo es que: ". . . [E]l argumento se cae por su propio peso. El . . . servicio público *requiere* que [los maestros] participen en la política activa *porque reconocidamente tiene[n] más talento* que el promedio del pueblo de Puerto Rico . . .". (Énfasis suplido.) *Vista pública sobre el P. del S. 249 y P. de la C. 718*, Comisión de Instrucción del Senado de Puerto Rico, 25 de marzo de 1960, pág. 37.

La posición que, respecto a este asunto, asume una mayoría de los integrantes del Tribunal en el día de hoy *resulta igualmente sorprendente*. Dicha acción legislativa, *conforme la opinión mayoritaria emitida*, no relega arbitrariamente a un plano de inferioridad a todos aquellos servidores públicos que, contrario a los maestros, no tienen derecho ni gozan de los beneficios de una licencia política con paga. Sencillamente, *según la mayoría*, el juicio legislativo merece total deferencia en la formulación de la política pública, razón por la cual debemos abordar los planteamientos sobre igual protección de las leyes con un criterio tolerante y estimativo.

---

(1) Sólo quedan excluidos los candidatos a asambleístas municipales. Véase Art. 3.14 de la Ley Núm. 68 de 28 de agosto de 1990 (3 L.P.R.A. sec. 393m).

*Disentimos. Somos del criterio que la referida pieza legislativa viola la Sec. 1 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1.*

I

La Carta de Derechos de nuestra Constitución postula la *dignidad del ser humano* como el *valor central* que orienta y determina los *derechos fundamentales* de nuestros ciudadanos. *Su terminología es clara y definitiva:*

La dignidad del ser humano es inviolable. Todos los hombres *son iguales* ante la Ley. *No podrá establecerse discrimen alguno por motivo de* raza, color, sexo, nacimiento, *origen o condición social,* ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana. (Énfasis suplido.) Const. E.L.A., ante, ed. 1982, pág. 257.

La transcrita disposición no sólo tuvo como base las disposiciones pertinentes de la Constitución de los Estados Unidos, sino además —quizás más importante aún por ser éstas más abarcadoras y recientes— en la Declaración Americana de los Derechos y Deberes del Hombre y en la Declaración Universal de Derechos Humanos de las Naciones Unidas. La citada Sec. 1 del Art. II de nuestra Constitución es tan expresiva como los artículos correspondientes de la Declaración Universal de Derechos Humanos de las Naciones Unidas, los cuales establecen:

Artículo 1— Todos los seres humanos nacen libres e iguales en dignidad y derechos y, dotados como están de razón y conciencia, deben comportarse fraternalmente los unos con los otros.

Artículo 2— 1. Toda persona tiene los derechos y las libertades proclamados en esta Declaración, sin distinción alguna de raza, color, sexo, idioma, religión, opinión política o de cualquier otra índole, origen nacional o social, posición económica, nacimiento o cualquier otra condición. A. Truyol y Serra, *Los derechos humanos: declaraciones y convenios internacionales,* Madrid, Ed. Tecnos, 1982, Parte I, Arts. 1 y 2(1), pág. 64.

A esos efectos establece, entre otras cosas, el Preámbulo de nuestra Constitución que "consideramos factores determinantes

en nuestra vida . . . la fe en la justicia; la devoción por la vida esforzada, laboriosa y pacífica; *la fidelidad a los valores del ser humano por encima de posiciones sociales, diferencias raciales e intereses económicos; y la esperanza de un mundo mejor basado en estos principios*". (Énfasis suplido.) *Preámbulo*, Const. E.L.A., ante, pág. 251.

Del Informe de la Comisión sobre la Carta de Derechos, de fecha 14 de diciembre de 1951, sometido ante la Constituyente, surge que el *propósito* de la citada Sec. 1 del Art. II de nuestra Constitución lo es el de

> . . . fijar claramente como base consustancial de todo lo que sigue el principio de la dignidad del ser humano y, como consecuencia de ésta, la igualdad esencial de todas las personas dentro de nuestro sistema constitucional. *La igualdad ante la ley queda por encima de accidentes o diferencias, bien tengan su origen en la naturaleza o en la cultura. Todo discrimen o privilegio contrario a esta esencial igualdad repugna al sistema jurídico puertorriqueño.* En cuanto fuera menester nuestra organización legal queda robustecida por la presente disposición constitucional, a la vez que obligada a ensanchar sus disposiciones para dar plena realización a lo aquí dispuesto. (Énfasis suplido.) Informe de la Comisión sobre la Carta de Derechos, ante, págs. 3–4.

En lo pertinente al caso ante nuestra consideración, al considerarse la enmienda para añadir la "condición social" entre las prohibiciones de discrímenes que establece la citada Sec. 1 del Art. II, *la Convención Constituyente expresó su preocupación e interés en que la misma fuese definida e interpretada correctamente.* Por lo revelador de la discusión en cuanto a este tema, transcribimos literalmente del Diario de Sesiones según lo acontecido el día 2 de enero de 1952:

> Sr. FERNANDEZ [MENDEZ]: . . . En la línea 5, ya sabemos que se insertó la palabra "condición" después de "origen", "origen o condición social". Nosotros hemos leído en la página 6 del Informe de la Carta de Derechos que "origen social", significa que esta expresión reafirma el principio de descartar toda gradación, favoritismo o prejuicio al sopesar los méritos de una causa judicial, de una solicitud en el servicio público, de una subasta, etc., *por motivo*

*de origen o condición social.* Esa es la única explicación que aparece aquí en el informe de la Comisión sobre lo que es origen o condición social y da dos o tres ejemplos de en qué situaciones es que este apartado protegería a alguna persona contra otra persona. *Ahora, preguntamos nosotros* al Presidente de la Comisión y querríamos que nos informara *en qué forma se hace válido, en qué forma se puede proteger ese derecho dentro de la estructura gubernamental que estamos creando con esta constitución,* o sea, en qué forma puede una persona que se sienta agraviada por algún discrimen en este sentido, hacer valer su derecho a que no se discrimine contra ella.

Sr. BENITEZ: Más adelante, en las líneas quinta, sexta y séptima, se establece que "tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana", *y lo que se ha establecido aquí son ciertos principios básicos y esenciales que tienen fuerza ex proprio vigore,* pero que además de tener fuerza por su propio vigor[,] habrán de requerir implementación de dos clases, educativa y jurídica. En lo que toca a la educativa, ya hay aquí un mandato al sistema de instrucción pública que habrá de respetar estos básicos principios. *En lo que respecta al sistema jurídico y en esto se refiere a la totalidad de la estructura legal del país, se subraya la inconstitucionalidad de todo favoritismo. Y todo reconocimiento [o] distinción habrá de estar motivado por mérito, por virtud, por esfuerzo, por talento. En lo que toca a qué es lo que se quiere decir con origen social, quiérese decir con origen social, que no importa la extracción de la persona, su situación económica, su condición en la comunidad, todos los puertorriqueños y todas las personas sujetas a las leyes de Puerto Rico son iguales ante nuestras leyes si se aprueba esta disposición y cualquier intento de hacer discrimen en favor o en contra de una de ellas es ilegal.* (Énfasis suplido.) 2 Diario de Sesiones de la Convención Constituyente 1382 (1952).

Resulta, en consecuencia, inescapable la conclusión que desde el preciso momento en que entró en vigor la Constitución del Estado Libre Asociado de Puerto Rico quedó *expresamente prohibido* en nuestra jurisdicción el discrimen por razón de raza, color, sexo, nacimiento, origen y condición social. *En lo pertinente al caso ante nuestra consideración,* ello naturalmente significa que no podrá discriminarse —a favor o en contra de persona alguna— *por razón de su condición o "status" en la comunidad;*

como tampoco por ser pobre o de cuantiosa fortuna; ni por ser prominente *o por tener o carecer de cierto grado de escolaridad.* El "reconocimiento" únicamente podrá estar fundado en razones de mérito, virtud, esfuerzo y talento.

Ante la clara intención e historial constitucional surge como *abrupto contraste* la legislación ante nos impugnada. *El privilegio establecido para los maestros del Sistema de Educación Pública del País hiere los principios básicos de dignidad e igualdad que garantiza la Sec. 1 del Art. II de la Constitución,* ante. La citada Ley Núm. 25 otorga una licencia con sueldo *exclusivamente* a los maestros en servicio activo del Departamento de Instrucción Pública al ser éstos oficialmente nominados para un cargo de elección popular. Al concederse tal privilegio se fomenta y promueve la participación de la clase magisterial en nuestro proceso político, en obvio perjuicio de otros empleados públicos, *creando así un discrimen por razón de condición social que violenta la cláusula de igual protección de las leyes garantizada por la Sec. 7 del Art. II de nuestra Constitución,* ante.

## II

Establece la mencionada Sec. 7 del Art. II de la Constitución del Estado Libre Asociado, ante, pág. 275, que:

> Se reconoce como derecho fundamental del ser humano el derecho a la vida, a la libertad y al disfrute de la propiedad. No existirá la pena de muerte. Ninguna persona será privada de su libertad o propiedad sin debido proceso de ley, *ni se negará a persona alguna en Puerto Rico la igual protección de las leyes.* No se aprobarán leyes que menoscaben las obligaciones contractuales. Las leyes determinarán un mínimo de propiedad y pertenencias no sujetas a embargo. (Énfasis suplido.)

El principio constitucional *sobre igual protección de las leyes,* consagrado en la antes transcrita Sec. 7 del Art. II, ante, persigue el *fin óptimo* de que se le brinde un *trato igual* a todas aquellas personas *similarmente situadas.* El mismo, obviamente, *no* requiere que situaciones que en efecto son distintas sean tratadas

por la ley como si fueran iguales. Ahora bien, el Estado puede, *inclusive*, aprobar leyes estableciendo clasificaciones que conlleven un trato desigual para ciudadanos que se encuentren en similares condiciones *siempre que* exista una razón o propósito gubernamental legítimo que *justifique* las clasificaciones o diferencias establecidas por la ley en controversia. *M. & B.S., Inc. v. Depto. de Agricultura*, 118 D.P.R. 319 (1987); *Vda. de Miranda v. Srio. de Hacienda*, 114 D.P.R. 11 (1983); *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64 (1983); J. Tussman y J. Ten Broek, *The Equal Protection of the Laws*, 37 Cal. L. Rev. 341 (1949).

Es debido a ello que, ante una ley que establece un trato desigual en relación con personas que se encuentran en similar situación, los tribunales deben dirigir su atención al *propósito* que inspiró a la Asamblea Legislativa al aprobar la ley en controversia y *su relación* con la clasificación establecida. Si dicha clasificación tiene relación con un propósito gubernamental legítimo —esto es, si existe una base permisible para la misma cuyo fin es adelantar los intereses legítimos del Estado— se deberá sostener la constitucionalidad de la ley. La medida de razonabilidad que tenga una clasificación legislativa dependerá directamente del éxito que la ley haya tenido en tratar de igual forma a aquellos que están similarmente situados ante ella. *Según se altera ese balance entre el propósito legislativo y la clasificación, para imponer cargas o beneficios al grupo que se clasifica, mayor será la tarea del Estado en probar que ello se justifica a base del bien común.* Tussman y Ten Broek, ante, págs. 344 y 365; *Zachry International v. Tribunal Superior*, 104 D.P.R. 267, 277 (1975).

Cuando un tribunal en Puerto Rico se enfrenta a un *análisis constitucional* sobre la razonabilidad de una clasificación legislativa, *dicho foro deberá usar uno de los dos criterios o escrutinios establecidos jurisprudencialmente para ese fin, a saber*: el escrutinio estricto o el escrutinio tradicional mínimo o de nexo racional.

*Vélez v. Srio. de Justicia*, 115 D.P.R. 533 (1983); *León Rosario v. Torres*, 109 D.P.R. 804 (1980).[2]

La doctrina prevaleciente en Puerto Rico sobre igual protección de las leyes le reconoce al Estado una *amplia latitud* en lo referente al establecimiento de clasificaciones *relativas a cuestiones sociales y económicas.* Hemos resuelto que en relación con estas cuestiones el escrutinio a utilizarse por los tribunales al examinar las leyes que establecen clasificaciones en estos campos lo es el de nexo racional o tradicional mínimo. *Vélez v. Srio. de Justicia,* ante. Como es sabido, al amparo de dicho escrutinio las clasificaciones establecidas por el legislador no se declararán inválidas a menos que sean claramente arbitrarias y no exista un interés legítimo del Estado en la clasificación cuestionada o que no pueda establecerse un nexo racional entre la clasificación impugnada y el interés estatal. *León Rosario v. Torres,* ante. Bajo el escrutinio racional, la ley impugnada goza de una presunción de constitucionalidad, lo cual, naturalmente, coloca el peso de rebatir la misma en la persona que impugna la validez de la legislación. *Zachry International v. Tribunal Superior,* ante, pág. 277.

Cuando nos enfrentamos a una clasificación en esta área lo normal y más prudente es que guardemos deferencia hacia el juicio legislativo. La deferencia que merecen las determinaciones legislativas —en torno a cómo se acomodan mejor los intereses sociales en conflicto en la arena socioeconómica— descansa, en parte, sobre el principio básico de que el proceso político de una democracia responde al deseo y al mandato de una mayoría del

---

(2) Como se sabe, el Tribunal Supremo federal ha reconocido y utilizado un criterio de análisis conocido por *escrutinio intermedio.* Se utiliza dicho análisis en situaciones que envuelven intereses individuales importantes que podrían tocar derechos fundamentales y que no han sido contemplados de forma expresa en la Constitución federal. *León Rosario v. Torres,* 109 D.P.R. 804, 814 (1980). Bajo este análisis, la ley se presumirá inconstitucional pero se sostendrá si el Estado demuestra algún interés público importante y una relación sustancial entre la ley y el propósito legislativo. *Craig v. Boren,* 429 U.S. 190 (1976). En los Estados Unidos el escrutinio intermedio se ha utilizado para analizar clasificaciones que discriminan por razón del género, *Orr v. Orr,* 440 U.S. 268 (1979); por razón de nacimiento, *Mills v. Habluetzel,* 456 U.S. 91 (1982), y por razón de extranjería, *Hampton v. Mow Sun Wong,* 426 U.S. 88 (1976), entre otras cosas. *Las clasificaciones que tradicionalmente han requerido un escrutinio intermedio en los Estados Unidos gozan de rango constitucional en nuestra Constitución y, por ende, ha sido innecesaria su adopción en Puerto Rico.*

pueblo. Los tribunales, de ordinario, no deben pasar juicio sobre la sabiduría o conveniencia política legislativa decretada por los representantes electos de la ciudadanía. *Vance v. Bradley*, 440 U.S. 93 (1979); *Dandridge v. Williams*, 397 U.S. 471 (1970); *M. & B.S., Inc. v. Depto. de Agricultura*, ante; *Vélez v. Srio. de Justicia*, ante; *Wackenhut Corp. v. Rodríguez Aponte*, 100 D.P.R. 518 (1972).

*Distinta es la situación* cuando la clasificación legislativa afecta *derechos fundamentales* del ciudadano o establece clasificaciones *inherentemente sospechosas*, esto es, que no guardan relación con la habilidad o aptitud de las personas afectadas por la clasificación. *Wackenhut Corp. v. Rodríguez Aponte*, ante. En esta situación es de aplicación el criterio conocido como "escrutinio estricto". *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715 (1980). Este análisis es en extremo riguroso y, bajo su interpretación, la ley impugnada se presumirá inconstitucional siempre. Será deber del Estado probar la constitucionalidad presentando prueba que demuestre que el ejercicio de su poder ha sido en beneficio del bien colectivo y de trascendencia tal que se justifica la restricción o exaltación de los derechos individuales que afecta a través del mismo. *Ante dicho escrutinio subsistirá únicamente aquella legislación donde el Estado logre demostrar exitosamente que*: (1) existe un interés apremiante que sustenta la clasificación discriminatoria; (2) tal clasificación es necesaria para lograr el propósito legislativo; (3) no existe un método menos oneroso para lograr dicho objetivo, y (4) existe una estrecha relación entre la ley y el propósito que persigue. Véase *Brown v. Board of Education*, 347 U.S. 483 (1954); *Loving v. Virginia*, 388 U.S. 1 (1967).

Como es sabido, todas las clasificaciones o discrímenes por motivo de raza, color, sexo, origen o *condición social*, ideas políticas o religiosas y nacionalidad son inherentemente sospechosas y tendrán que enfrentarse al escrutinio estricto. Véanse: *Almodóvar v. Méndez Román*, 125 D.P.R. 218 (1990); *León Rosario v. Torres*, ante, pág. 813; *Zachry International v. Tribu-*

*nal Superior*, ante, pág. 279; *Wackenhut Corp. v. Rodríguez Aponte*, ante, pág. 531.

## III

El "razonamiento y análisis" que lleva a cabo el Tribunal para llegar a la conclusión deseada de que la legislación en controversia es constitucionalmente válida *realmente sorprende por lo superficial y liviano que resulta ser el mismo.* Dicho con el mayor respeto, el "razonamiento" utilizado por la mayoría es tan infantil y acomodaticio que nos trae a la mente el estribillo aritmético que se utiliza en los grados primarios para enseñarle a sumar a los niños; esto es, "dos más dos, es cuatro; cuatro más dos, son seis . . . .".

La opinión mayoritaria emitida, partiendo convenientemente de la premisa de que "el estatuto impugnado no genera clasificación sospechosa alguna ni afecta un derecho fundamental", inmediatamente concluye que la "controversia . . . debe evaluarse a la luz de un escrutinio tradicional mínimo". Opinión mayoritaria, págs. 875 y 876. A renglón seguido, la mayoría dictamina que la legislación en controversia no infringe la Constitución del Estado Libre Asociado de Puerto Rico por cuanto la misma tiene varios propósitos legítimos que establecen un nexo racional entre la clasificación impugnada y el interés del Estado. Esto es, "cuatro más dos, son seis; seis más dos, son ocho, y ocho, diez y seis".

¿Es correcto dicho "método de razonamiento y análisis constitucional"? Creemos que no; *veamos por qué.*

Ausente *de la faz* de un estatuto —cuya constitucionalidad se impugna por alegadamente establecer éste una clasificación constitucionalmente impermisible— una clara e inequívoca indicación de que la clasificación establecida afecta un derecho fundamental o que la misma crea una clasificación inherentemente sospechosa, *el descargo responsable de la función de revisión judicial exige,* en primer lugar, que determinemos si el propósito legislativo —según lo expresa el legislador— es legítimo, es decir, si no está vedado por la Constitución. *A renglón seguido,* y como segundo

paso, *el foro judicial debe determinar* si la clasificación establecida por el estatuto tiene o no relación racional con el propósito legislativo.

*Ahora bien, la función judicial responsable no termina ahí.* Ante la impugnación constitucional, no basta con el propósito expresado por el legislador. La búsqueda y determinación del "propósito legislativo" requiere que el foro judicial realice un examen objetivo de la pieza legislativa en controversia. Esto es, el tribunal no puede *meramente limitarse* a examinar la exposición de motivos de la ley; *se debe realizar un examen comprensivo del estatuto y del historial legislativo del mismo.*

Dicho lo anteriormente expresado en palabras sencillas, un tribunal que pretende descargar su función judicial en forma juiciosa y responsable no se puede dar el lujo de permitir que un estatuto —que es inconstitucional— "logre eludir" el cedazo de revisión judicial correcto meramente porque de su faz no surjan las consideraciones constitucionalmente sospechosas e impuras que condujeron a su adopción. Véase, a modo ilustrativo, *Hunter v. Underwood,* 105 S. Ct. 1916 (1985). *Lamentablemente, bajo el análisis superficial y liviano realizado por la mayoría, así ha ocurrido en el presente caso.*

## IV

Como se señala en la opinión mayoritaria emitida, tres fueron los propósitos *enunciados por el legislador* al aprobar la citada Ley Núm. 25, ante, a saber: (1) permitir la participación de los maestros en el proceso político del país; (2) evitar la contaminación del sistema de instrucción pública con la política partidista, y (3) conceder un incentivo gubernamental a la clase magisterial para facilitarle el acceso a la papeleta electoral.

Del primer propósito se encarga la Sec. 4 de la Ley Núm. 25, ante, 18 L.P.R.A. sec. 249b, donde "[s]e reconoce [el] derecho de los maestros . . . a participar en cualquier momento u ocasión en campañas y actividades políticas, a ser candidatos para cargos públicos electivos o de nombramiento, y a defender sus propias

candidaturas o la . . . de cualquier otra persona". El segundo objetivo, la despolitización de la escuela, se garantizó mediante la aprobación de la Sec. 5 de la Ley Núm. 25, ante, 18 L.P.R.A. sec. 249c.(3) *Esta sección prohíbe a los maestros ejercer sus derechos políticos dentro del salón de clases.* En adición, les apercibe que cualquier infracción a esta norma "se considerará conducta profesional impropia y constituirá causa para [iniciar una] acción disciplinaria" en su contra. *Finalmente, la Sec. 6 de la Ley Núm. 25, ante, 18 L.P.R.A. ant. sec. 249d, se encargó de facilitarle el acceso a puestos electivos mediante la concesión de una licencia política con paga y mediante el relevo automático del desempeño de sus tareas docentes.*

Ahora bien, resulta procedente enfatizar que un estudio integral del estatuto y del historial legislativo del mismo *revela que no es correcto que la intención principal del legislador,* al aprobar la citada Ley Núm. 25, *fuera la de mantener un ambiente docente en nuestras escuelas de instrucción pública libre de banderías, prejuicios y pasiones políticas*; propósito que, posiblemente, sería el único que cualificaría como "interés apremiante" bajo un análisis de "escrutinio estricto". Como vemos, la Sec. 4 de la Ley Núm. 25, ante, permite que el maestro participe en cualquier momento u ocasión en campañas y actividades políticas. Además, lo autoriza a defender la candidatura de otras personas a puestos políticos sin límite de tiempo. *No creemos que pueda ponerse en duda que en ambas circunstancias la escuela se ve potencialmente amenazada por los peligros de la contaminación política.* Sin embargo, bajo esa situación no hay derecho al relevo automático con una licencia política asalariada. *La razón es evidente. La concesión del relevo automático y de la licencia política no fue diseñada por el legislador para proteger a la escuela del fragor y estrépito político. El remedio para este mal se halla en la prohibición expresa al maestro de adelantar ideales políticos dentro de los predios de la escuela bajo el apercibimiento de sanciones disciplinarias.*

---

(3) *Cf.* Art. 3.14 de la Ley Núm. 68, ante, en esc. 1.

En cuanto a este aspecto, otro dato resulta revelador. Al amparo del Art. 4.008-A de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3158a, un maestro, como aspirante a un puesto electivo, puede radicar y comenzar a defender su candidatura desde el mes de enero del año eleccionario.(4) De otro lado, conforme a la Ley Núm. 68 de 28 de agosto de 1990 (3 L.P.R.A. sec. 391 *et seq.*), enmendando la Sec. 6 de la Ley Núm. 25, ante, el relevo automático y la concesión de la licencia política con sueldo ocurre a partir del primero (1ro) de agosto de dicho año. Como resultado, un maestro puede defender activamente su candidatura oficial durante siete (7) meses, mientras simultáneamente ejerce sus labores docentes en la escuela. *De nuevo, resulta obvio que la concesión de las licencias políticas no tiene como objetivo mantener despolitizado el ambiente escolar.* No podemos imputarle a la Asamblea Legislativa la realización de un acto inútil al aprobar la ley que enmendó la Sec. 6 de la Ley Núm. 25, ante. *Flamboyán Gardens v. Junta de Planificación*, 103 D.P.R. 884, 888 (1975). "[N]o se presume que la Legislatura hace cosas fútiles." *Talcott Inter-Amer. Corp. v. Registrador*, 104 D.P.R. 254, 262 (1975).

*La realidad y el hecho fundamental es que el verdadero propósito del legislador al aprobar la Sec. 6 de la Ley Núm. 25, ante, fue uno totalmente ajeno al objetivo de despolitizar la escuela.* Así palpablemente surge del informe que sobre la Ley Núm. 25, ante, rindiera el 4 de mayo de 1960 la Comisión de Instrucción del Senado de Puerto Rico, según el cual:

La licencia con sueldo al maestro que es llamado a participar en la lucha política le da la seguridad económica tan necesaria para la tranquilidad suya y de su familia al propio tiempo que le liberta de

---

(4) *"Sec. 3158a. Radicación de candidaturas*

"Se podrán radicar candidaturas para todos los puestos públicos sujetos a elección general en o antes del quince de marzo del año en que se hayan de celebrar las mismas. En caso de radicar un número de candidatos exacto o menor a los puestos objeto de nominación por ese partido, luego de cumplir con los otros requisitos de este Subtítulo, los mismos quedarán certificados automáticamente como los candidatos oficiales de dicho partido y no tendrán que radicar peticiones de primarias.—Diciembre 20, 1977, Núm. 4, p. 639, art. 4.008-A, adicionado en Enero 10, 1983, Núm. 3, p. 385, sec. 82, en. Enero 10, 1983."

las limitaciones a que de otro modo tendría que someterse en el cumplimiento de sus obligaciones pedagógicas.

Consideramos que con estas medidas se asegura el pleno ejercicio de los derechos políticos del maestro, y al propio tiempo *se le asegura a la comunidad puertorriqueña los beneficios que ha de derivar de la participación plena en los procesos públicos de una de las principales clases directivas del país.* (Énfasis suplido.) Comisión de Instrucción del Senado de Puerto Rico, 4 de mayo de 1960, pág. 2.

Esto es, el *propósito principal* que animó a la Asamblea Legislativa de Puerto Rico al aprobar la citada Ley Núm. 25 lo fue darle al maestro la "seguridad económica tan necesaria para la tranquilidad suya y de su familia"; ello por razón de la *alegada "superioridad"* de la clase magisterial del País. En otras palabras, *no hay la menor duda sobre el hecho de que nos enfrentamos a una motivación, o propósito legislativo, discriminatorio por razón de "condición social".*

¿*Qué hacer ante esta situación?* Somos del criterio que existiendo evidencia fehaciente del hecho de que una motivación impropia fue factor en la decisión y curso de acción legislativa, la deferencia judicial que, de ordinario, observamos hacia esta rama política al aplicar el escrutinio mínimo ya no se justifica. *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252 (1977). Bajo nuestro ordenamiento jurídico, una motivación discriminatoria nunca puede catalogarse como una consideración legislativa constitucionalmente inofensiva. Poco importa precisar si la motivación discriminatoria fue el factor dominante o primario que dio base a la aprobación del estatuto. En escasas ocasiones, si no nunca, puede afirmarse que un cuerpo legislativo actúa motivado por una sola preocupación. *Arlington Heights v. Metropolitan Housing Corp.*, ante. Lo importante es que la motivación discriminatoria no haya jugado un papel trivial en el proceso decisional, de forma que razonablemente podamos concluir que la misma afectó el resultado final, es decir, la aprobación de la ley. *La solución constitucionalmente correcta en estos casos tiene que ser abandonar la aplicación del escrutinio tradicional, considerar la motivación discriminatoria como sospechosa y aplicar el escrutinio estricto*

*de supervisión judicial.* Véase P. Brest, *Palmer v. Thompson: An Approach to The Problem of Unconstitucional Legislative Motive,* 1971 Sup. Ct. Rev. 95, 118–119.

## V

Según ha quedado evidenciado, la Sec. 6 de la citada Ley Núm. 25, ante, establece *una clasificación basada en un discrimen por razón de condición social a favor de los maestros.* Ello, naturalmente, constituye una *violación* del Art. II, Sec. 1 de nuestra Constitución, ante, y es, en consecuencia, *una clasificación sospechosa.* A la luz de lo señalado anteriormente, para determinar si en efecto existe una violación de la cláusula sobre igual protección de las leyes, *es imperativo que se someta la pieza legislativa al más riguroso escrutinio de revisión judicial.*

*En consecuencia, procede que nos preguntemos si:* (1) existe un *interés apremiante* que sustente la clasificación discriminatoria; (2) tal clasificación *es necesaria* para lograr el propósito legislativo; (3) no existe un *método menos oneroso* para lograr dicho objetivo, y (4) existe una *estrecha relación* entre la ley y el propósito que persigue la misma. Véase *Brown v. Board of Education,* ante.

Hemos visto que los legisladores estuvieron motivados por la convicción de que los integrantes de la clase magisterial poseían "reconocidamente . . . más talento que el promedio del pueblo de Puerto Rico de donde a veces se sacan los candidatos". *Vista pública,* ante, pág. 37. Dicha motivación constituye *la razón* por la cual *se premió* a los maestros sobre el resto de los empleados públicos. Nos preguntamos, *¿puede seriamente el Estado sostener y probar que las cualidades de talento y espíritu profesional y cívico de los maestros son tan superiores al resto de los empleados del Gobierno de Puerto Rico que se justifica dicho trato deferencial y privilegiado?* Salta a la vista y hiere la retina, *In re Roldán González,* 113 D.P.R. 238, 242 (1982), que la posición discriminatoria del legislador respecto a este asunto y la opinión mayoritaria que ratifica la misma *constituyen un insulto gratuito*

*a todo aquel empleado público que no es un maestro de instrucción pública.*

Naturalmente, como ciudadanos, los maestros tienen el derecho —al igual que el resto de la ciudadanía— a participar en la contienda política del país. Habiéndosele prohibido anteriormente dicho derecho, éste les fue concedido mediante la Sec. 7 de la Ley Núm. 25, ante, 18 L.P.R.A. ant. sec. 249e. *No obstante, es innecesario concederles una licencia con sueldo por ser igualmente innecesario requerirles que abandonen sus labores docentes.* La misma Ley Núm. 25, ante, provee el remedio. Ante la legítima preocupación legislativa de que se despolitice la escuela, la Sec. 5 de la citada Ley Núm. 25, ante, ordena a los maestros *abstenerse* de hacer política en las aulas. Constatado el hecho de que les asiste el derecho a formar parte del proceso eleccionario y, por otra parte, existiendo protección al estudiantado de contaminación política mediante la imposición de sanciones a los maestros, *no hay duda que resulta superflua e inútil la Sec. 6 de la Ley Núm. 25, ante, en la consecución de los mencionados propósitos.*

Por otro lado, la Sec. 6 de la Ley Núm. 25, ante, según enmendada, es completamente ineficaz en lograr aislar al estudiantado del contacto con maestros que son candidatos a puestos públicos. *Ello corrobora el hecho de que no existe,* como debiera existir ante el escrutinio riguroso, *un interés apremiante de establecer la clasificación legislativa para lograr la despolitización de las aulas.* Dentro de la citada Sec. 6 de la Ley Núm. 25 está inmersa la insostenible premisa de que, a pesar de la posibilidad de sanciones, los maestros son incapaces de separar su rol como candidatos a puestos políticos del de educadores. *No podemos refrendar dicha posición.* Bajo el anterior análisis, tan inconstitucional es el que se obligue a un maestro a dejar su cátedra, como lo es otorgarle, de forma exclusiva, una licencia política con sueldo. *Resulta obvio, repetimos, que la validez de la mencionada Sec. 6 de la Ley Núm. 25 no puede ser sostenida bajo un análisis de igual protección de las leyes.*

Fomentar y auspiciar las candidaturas de los maestros, no a base de sus méritos, sino a base de su condición social, incide en la prohibición expresa de discrimen de la Sec. 1 del Art. II de nuestra Constitución, ante. *El Estado, teniendo el peso de rebatir la presunción de inconstitucionalidad de la citada Sec. 6 de la* Ley Núm. 25, *no ha podido demostrar ni un interés apremiante ni una relación necesaria entre la clasificación y el propósito legislativo que sostengan su validez constitucional.*

En síntesis, por violar la cláusula de igual protección de las leyes, al establecer un discrimen insostenible bajo nuestra Constitución, *decretaríamos la inconstitucionalidad de las licencias políticas con sueldo a los maestros del Sistema de Educación Pública.*

Dicha solución no sólo es la *jurídicamente procedente* desde un punto de vista constitucional, sino que es la *correcta* desde el punto de vista del bienestar general del Pueblo de Puerto Rico. En estos momentos —en que la situación fiscal del País impide que se atiendan los reclamos justos de una ciudadanía que carece de servicios básicos, en que alegadamente no hay dinero suficiente para combatir la rampante criminalidad que azota a nuestro País, etc.— *resulta irónico que se malgasten y derrochen cientos de miles de dólares, quizás millones, en subsidiar las aspiraciones políticas de unos empleados públicos*; subsidio ilegal e innecesario que, *increíblemente*, está basado, en el favoritismo y en la opinión discriminatoria del legislador a los efectos de que los maestros "reconocidamente tiene[n] más talento que el promedio del pueblo de Puerto Rico. . .". *Vista pública*, ante, pág. 37.

Ahora bien, si *increíble* es la actuación legislativa, *inconcebible* resulta ser la confirmación y ratificación de la misma por parte de una mayoría de los integrantes de este Tribunal. La historia se encargará de juzgar la conducta y actuación judicial mayoritaria de este "nuevo" Tribunal. Nos atrevemos a pronosticar que el dictamen no será muy elogioso y favorable a menos que prontamente se realice que el compromiso que se contrajo al juramentar el cargo lo fue únicamente con la justicia, la verdad y lo que es correcto en derecho.